PINE CREST MEMORIAL PARK *v.* BURTON.

5-1530                                    312 S. W. 2d 919

Opinion delivered May 12, 1958.

*McMillen, Teague & Coates,* for appellant.

*John F. Park,* for appellee.

CARLETON HARRIS, Chief Justice.   Pine Crest Memorial Park is a privately owned cemetery, organized and operated under the terms of a certain declaration of trust, dated January 30, 1930.   The management of the cemetery is the responsibility of a board of trustees. Under the authority of the Declaration, the trustees are empowered to make rules and regulations for the operation of the property, and rule 42 provides that only bronze markers shall be used.[1]   In 1936, appellee's mother purchased from appellant a cemetery lot having four grave spaces.   Appellee's father was buried on this lot in 1936, and in 1955, the mother was buried in one of the spaces.   Appellee, M. P. Burton, decided to purchase a double marker for the graves of his father and mother, and found a satisfactory marker at the Wyatt-Monahan Monument Company for the installed price of $173.40.   Appellant refused to permit the installation of this marker, contending that certain rules of Pine Crest had not been complied with.   Upon hearing the case, the Chancellor held that the rules in question were unreasonable and arbitrary, and perpetually enjoined and restrained appellant and its board of trustees from enforcing or attempting to enforce such regulations. From such decree of the court, comes this appeal.

The deed conveying the cemetery lot to Mrs. Burton provides as follows:

"It is expressly agreed and understood that this conveyance is made subject to the provisions and restrictions specified in the Rules and Regulations of said Memorial Park at the present time, and which are made a part of this conveyance or which said Trust may hereafter make in conformity with the laws of the State of Arkansas, one of which Rules and Regulations, among other things, reserves to the Trust the exclusive right to control, regulate, install or have installed, all markers, and further reserves to the Trust the right to ap-

---

[1] This particular regulation is not under attack.

prove and supervise all construction, care and up-keep of all lots, burial spaces and graves in said PINE CREST MEMORIAL PARK.

The said Trust hereby covenants and agrees with the said grantee to set aside ten per cent of the gross sale price of this and all other deeds by it issued for lots and burial spaces in said PINE CREST MEMORIAL PARK, said fund so constituted to be known as the PERPETUAL CARE FUND, the principal of which shall remain intact and the income of which shall be applied toward the cost of the care, up-keep, and maintenance of said PINE CREST MEMORIAL PARK forever.''

It is admitted by appellee that appellant has the right to make reasonable rules and regulations. It is, on the other hand, admitted by appellant that appellee would not be bound by an arbitrary or unreasonable rule. The issue therefore, in this case, is whether the particular rules and regulations of Pine Crest Memorial Park, herein under attack, are arbitrary and unreasonable.

The controversial regulations, applying to grave markers, are as follows:

''48.  (b)  The Bronze Alloy shall consist of:[2]

| | |
|---|---|
| Not less than | 87% Copper |
| Not less than | 5% Tin |
| Not more than | 2½% Lead |
| Not more than | 5% Zinc |
| All other elements in total not to exceed | 1% |

49.  With all bronze markers or memorials not purchased through the Park, the Owner offering such marker or memorial for installation must furnish the Park an affidavit of analysis from an independent laboratory made on a test bar run from the heat from which the specific memorial or marker offered for acceptance by the Park was cast. Analysis of smelter of ingot supplied to the manufacturer is not acceptable.

---

[2] One exception to the content is permitted—a marker furnished a veteran by the United States government.

52.  All markers or memorials shall be installed by the Park, on foundations built by the Park, at the cost of the Owner, and the Park shall assume responsibility for the proper construction of the foundation and the proper installation of such marker or memorial; but the Park shall not be liable for any defective materials or defective workmanship beyond replacement or repair of such defective materials as have been furnished by the Park.  All foundations shall be of the size and material specified by the Park.

54.  If the marker or memorial is purchased from an outside agent and is approved by the Park as hereinbefore more particularly set forth, the charge for service and installation shall be on the basis of seven cents (7c) per square inch of the size of the marker and an additional charge or contribution of seven cents (7c) per square inch of the size of the marker to the Perpetual Care Fund, to be used for the maintenance and operation of the Park.  No installation shall be made until both the service charge and the contribution to the Perpetual Care Fund have been paid in cash in advance.'' We proceed to a discussion of each regulation.

The marker purchased by Mr. Burton from Wyatt-Monahan has an alloy content of: 85 per cent copper; 5 per cent lead; 5 per cent tin; 5 per cent zinc. Appellee argues that such content substantially complies with the regulation mentioned above.  Mr. D. A. Newman, secretary of Newman Brothers, Inc., manufacturer of the marker, testified that his firm has, for many years, used the 85-5-5-5 alloy for casting markers.  He stated that each manufacturer has his own preference for a certain analysis, some using the same alloy as Newman Brothers, and others using a different formula  .  .  .  there is no set formula from which bronze markers should be cast  .  .  .  among twelve manufacturers of bronze markers, nine different alloys were being used, ranging in copper content from 83 per cent to 88 per cent; tin, 2 per cent to 6 per cent; lead, 1.5 per cent to 5 per cent; zinc, 4.25 per cent to 11 per cent  .  .  .  tests at the company indicated their markers would meet all reasonable standards for durability, corrosion and discol-

oration resistance. Mr. Newman is 32 years of age and holds a bachelor of laws degree from Cincinnati University. He received no metallurgical training in college, and testified that his knowledge of the subject has come from association in the business, and the reading and studying of various materials. Mr. William E. Hockenberger of Pittsburgh, Pennsylvania, was an important witness for appellant. Mr. Hockenberger is vice-president, metallurgist, and metallurgical engineer of the Pennsylvania Industrial Supply Company, a copper, brass, and aluminum warehouse. He graduated as a metallurgical engineer from the Carnegie Institute of Technology, following which he served as research engineer and subsequently as metallurgical engineer for Chase Brass & Copper Company before entering his present employment. Mr. Hockenberger testified that copper, tin, and zinc form a true alloy, *i. e.*, one which will mix together in any proportion and their components are not discernible. He stated lead does not enter into any composition at all . . . "\* \* \* does not enter into alloys. It separates in the matter and can readily be seen under the microscope." He stated lead served no useful purpose other than to "make it more machineable." Mr. Hockenberger testified that he had examined the Pine Crest rules and regulations, and that this particular regulation contained the minimum for bronze. When asked if he was familiar with the composition of 85 per cent copper, 5 per cent zinc, 5 per cent tin and 5 per cent lead, he stated:

"A. 85 and three five's is widely used ingot due to the fact that it is easy to fabricate. It is easy to case and is a fast color, used in plumbing materials, various jobs in castings. I would say it is an industrial alloy more than anything else. It is known as leaded red brass.

Q. It is widely used for plumbing fixtures?

A. Yes, probably the most common one it is used for.

Q. In these books you have here, which I understand from you to be the leading books on standards, how is the composition 85,5,5,5 listed?

A. 85,5,5,5 is listed in A. S. T. M.[3] and all books as leaded red brass. It is not bronze.

Q. What would be the effect of five per cent of lead in there on weather?

A. In case of weathering I would say it would be a detriment in large quantities of lead, some of which would be on the surface, it would probably weather out. I would say it would certainly weather out. The corrosion products are undesirable."

On cross examination, Mr. Hockenberger further testified:

"A. Repeating again, 5 per cent lead in there is a detriment. It is a detriment to the alloy, performs no function. It just discolors it after weathering.

THE COURT: Makes it cut easier?

A. Yes. I am sure somebody that buys a marker is not interested in how it cuts. The manufacturer would be.

Q. That small a difference in the percentage makes a whale of a difference in the marker?

A. What percentage?

Q. 85 per cent copper and 87 per cent copper and 5 per cent tin in both—in other words, Newman requires 85 per cent copper, Pine Crest requires 87 per cent, two per cent difference in copper. Newman requires 5 per cent tin, so does Pine Crest. Newman requires 5 per cent lead and Pine Crest requires 2 1/2 per cent. Would that make all that difference of softness and discoloration?

A. You are doubling the quantity.

Q. There is 100 per cent in that marker and 2 1/2 per cent is not going to soften and discolor 97 1/2 per cent, is it?

A. If it was in the alloy, no, but it is not in the alloy, and the more lead in the mixture, the more difficult it is to get it finally disbursed.

[3] American Society for Testing Material.

Q. What I am getting at, there is only 2 1/2 per cent difference in the Pine Crest marker and in the Newman marker with reference to lead?

A. That's right.

Q. Newman has 2 1/2 per cent more lead?

A. That's right.

Q. Would that additional 2 1/2 per cent prevent the disbursal of all the other alloys to the extent it would soften it or make it accessible to discoloration to any great extent.

A. You are doubling the lead content. You have more chance of it being on the surface and be in larger globules.''

According to the testimony, the Battelle Memorial Institute at Columbus, Ohio, an independent research laboratory, has done various tests on bronze alloys in connection with bronze memorials, and on the basis of such tests, has made the following recommendation as to mixture: 86 per cent to 90 per cent copper, 5 1/2 per cent to 6 1/2 per cent tin, 1 per cent to 2 per cent lead, and 3 per cent to 5 per cent zinc. The principal objection to the formula used in the Wyatt-Monahan monument seems to be the amount of lead contained in same, and we are persuaded that the 2 1/2 per cent difference in the amount called for under the regulations, and the amount contained in the purchased marker, is great enough to make a difference in the durability of the monument. It might be said here that this case has been well briefed by both sides, and numerous authorities cited,[4] in support of their respective positions as to each rule herein contested, some being favorable to appellant

---

[4] Among such cases are: *Orlowski* v. *St. Stanislaus Roman Catholic Church Society*, 161 Misc. 480, 292 N. Y. S. 333; *Roanoke Cemetery Company* v. *Goodwin*, 101 Va. 605, 44 S. E. 769; *Wetherby* v. *City of Jackson*, 264 Mich. 146, 249 N. W. 484; *A. W. Carlson, Inc.* v. *Judd*, 133 Conn. 74, 48 A. 2d 269; *Chariton Cemetery Co.* v. *Chariton Granite Works*, 197 Iowa 403, 197 N. W. 457; *Roselawn Memorial Park* v. *DeWall*, 11 Ill. App. 2d 66, 136 N. E. 2d 702; *Johnson* v. *Cedar Memorial Park Cem. Assn.*, 233 Iowa 427, 9 N. W. 2d 385; *Zimmer* v. *Congregation of Beth Israel*, 203 Cal. 203, 263 P. 232; *Abell* v. *Proprietors of Green Mount Cemetery*, 189 Md. 363, 56 A. 2d 24, 174 A. L. R. 971.

and some to appellee. Practically all the pertinent cases deal with particular requirements of various cemeteries, and all were determined on the basis of discrimination or the reasonableness or unreasonableness of the particular regulation in question. We are of the opinion that the rule here under discussion is reasonable. Appellee is not compelled to purchase a monument of this specific content. It is only a minimum standard. For instance, one containing 90 per cent copper would be permissible. A marker prepared under the required formula can certainly be obtained. As the evidence shows, there are dealers who would prepare this particular alloy. Appellee says that the content of 85-5-5-5 is substantial compliance with the Pine Crest regulation, but, under the proof, we cannot agree.

To the contrary, we consider rule 49 to be unreasonable. The requirement that an affidavit of analysis from an independent laboratory made on a test bar run from the heat from which the specific marker was cast, would be most difficult to obtain. The rule provides analysis of smelter and ingot supplied by the manufacturer is not acceptable. Not only does this provide an extra burden and expense, but, likewise, is discriminatory. This requirement relates only to markers "not purchased through the park." As stated in Vol. 14, *Corpus Juris Secundum,* Sec. 30, page 89:

"The proprietors of a cemetery may make rules and regulations for the care and management of lots in the cemetery, * * *. The rules and regulations must be reasonable, equal in their operation and uniform in their application to all owners of lots in the cemetery."

It appears that the particular effect of this rule is to practically give appellant a monopoly on supplying grave markers in the cemetery, and we hold the Chancellor was correct in holding this requirement to be unreasonable and arbitrary, and thus unenforceable.

After purchasing his marker from Wyatt-Monahan, Mr. Burton selected that company to install same. Pine Crest refused to permit this to be done, contending that under their regulations, they had the exclusive right to

install monuments. The trial court held this regulation to be unreasonable and enjoined appellant from enforcing or attempting to enforce such rule. Under the facts of this case, we approve rule 52, though in doing so, we should like to clearly emphasize that we are not, in general, approving a regulation which gives a cemetery the exclusive right to install monuments. Here, the cemetery regulations[5] provide that the marking of each grave is "restricted and limited to flat bronze tablets, set flush with the turf." The testimony reflects that after a period of years, these monuments may shift or tilt from their original position, and it is necessary to reset them. Pine Crest, having agreed with the lot purchaser, to furnish perpetual care, may well be required at some time in the future, possibly even several times, to reset any marker installed by Burton. This being true, the cemetery should have the privilege of originally installing the monument in a manner that, from its experience, will least necessitate an early resetting.

Having decided rule 52 to be valid, we conclude that the charge of 7c per square inch for installation, set out in rule 54,[6] is also reasonable. Certainly, the charge is not exorbitant. Appellee states that this provision is discriminatory in that it only applies to persons who purchase their markers from outsiders, but the testimony reflects that the installation charge is included in the price of the monuments sold by Pine Crest. In other words, all lot owners pay this charge, irrespective of the source from which their monument is purchased. However, we do not agree that the 7c per square inch charge for the Perpetual Care Fund is valid, for the reason that Mrs. Burton, in purchasing this lot, had already contributed to this fund. As previously set out, the trust agreed with the grantee to set aside 10 per cent of the gross sale of the lot as a "PERPETUAL CARE FUND, the principal of which shall remain intact and the income of which shall be applied toward the cost of the care, up-keep, and maintenance of said PINE CREST MEMORIAL PARK forever." Appellant argues that

[5] Rule 47.
[6] This rule was adopted in 1955.

the intent of rule 54 is to provide a fund ''for the perpetual care of markers rather than for the park,'' but the regulation plainly states otherwise. We conclude that this portion of rule 54 constitutes a duplicate charge.

Summarizing, we hold:

(1) Rule 48 (b) is reasonable, and therefore valid.

(2) Rule 49 is unreasonable and discriminatory, and therefore invalid.

(3) Rule 52 is valid.

(4) The portion of rule 54 providing for a charge for service and installation is valid; that portion providing for a charge to the Perpetual Care Fund is invalid.

It is so ordered.

Justice WARD dissents, being of the opinion that all regulations are proper. Justice ROBINSON dissents.

SAM ROBINSON, Associate Justice. In 1936 appellee's mother, Mrs. J. W. Burton, purchased from appellant a certain cemetery lot having four grave spaces. J. W. Burton was buried on the lot in 1936. In 1955 Mrs. Burton was buried in one of the spaces. Not being satisfied with the marker purchased in 1936 for the grave of his father, appellee, M. P. Burton, decided to purchase a double marker for the graves of his father and mother. The appellant offered to sell such marker for $250.00, plus an installation charge of 7c per square inch, amounting to $40.04, or a total of $290.04. On shopping around appellee found a marker satisfactory to him at the Wyatt-Monahan Monument Company for the installed price of $173.40. Appellant refused to permit the installation of the Wyatt-Monahan marker, contending that certain rules of the appellant had not been complied with. It goes without saying that appellee would not be bound by just any rule appellant could adopt. Certainly a rule providing that nothing except solid gold markers could be installed would be unenforceable. In fact, the appellant makes no contention that the rules can be sustained if unreason-

able. Appellant says: "The issues is this case are as to whether or not the rules and regulations of Pine Crest Memorial Park are arbitrary and unreasonable."

The marker from the Wyatt-Monahan Company has an alloy content of: 85% copper; 5% lead; 5% tin; 5% zinc. Mr. D. A. Newman, secretary of Newman Brothers, Inc., manufacturer of the Wyatt-Monahan marker, stated that for many years his firm and other foundries have used 85-5-5-5 alloy for casting markers. The cemetery rules require a marker consisting of not less than 87% copper; not less than 5% tin; not more than 2½% lead; not more than 5% zinc.

In my opinion a preponderance of the evidence shows that for all practical purposes there is no distinction between the marker supplied by Wyatt-Monahan Company and those appellant has for sale. True, there is some difference, but the only real difference is the price. So far as looks are concerned, it takes a magnifying glass to tell there is any difference at all. And there is no evidence to the effect that there is any practical difference in the lasting qualities. In my opinion, the evidence fully sustains the chancellor, and the decree should be affirmed. Therefore I respectfully dissent.