CHARLES FRANK, TRADING AS WOODBRIDGE MONU-
MENT WORKS, PLAINTIFF-APPELLANT AND CROSS-
RESPONDENT, v. CLOVER LEAF PARK CEMETERY
ASSOCIATION, A CORPORATION, DEFENDANT-RE-
SPONDENT AND CROSS-APPELLANT.

CLOVER LEAF PARK CEMETERY ASSOCIATION, A COR-
PORATION OF THE STATE OF NEW JERSEY,
PLAINTIFF-RESPONDENT AND CROSS-APPELLANT, v.
CHARLES FRANK, TRADING AS WOODBRIDGE MONU-
MENT WORKS, DEFENDANT-APPELLANT AND CROSS-
RESPONDENT.

LAKE NELSON MEMORIAL PARK ASSOCIATION, A COR-
PORATION OF THE STATE OF NEW JERSEY, PLAIN-
TIFF-RESPONDENT, v. CHARLES FRANK, TRADING AS
WOODBRIDGE MONUMENT WORKS, DEFENDANT-AP-
PELLANT.

Argued January 6, 1959—Decided February 16, 1959.

194

*Mr. Howard Stern* argued the cause for appellant and cross-respondent, Charles Frank, trading, etc. (*Messrs. Hofstra & Hofstra,* attorneys).

*Mr. David Landau,* Deputy Attorney General, argued the cause *amicus curiae* (*Mr. David D. Furman,* Attorney General of New Jersey).

*Mr. Samuel Kaufman* argued the cause for defendants and cross-appellants Clover Leaf Park Cemetery Association and Lake Nelson Memorial Park Association (*Messrs. Kaufman, Kaufman & Kaufman,* attorneys; *Mr. Andrew L. Kaufman,* of counsel).

The opinion of the court was delivered by

FRANCIS, J.   Certification was granted to review the determination of the Chancery Division of the Superior Court with respect to the validity of certain rules and regulations and allegedly *ultra vires* commercial practices of the defendant Clover Leaf Park Cemetery Association.

The plaintiff Charles Frank has been engaged in selling and installing bronze and granite cemetery markers, plaques and monuments for more than 28 years.   During that period, his place of business has been in Woodbridge, New Jersey,

about a mile from the defendant's cemetery. Defendant Clover Leaf Park Cemetery Association is a memorial park cemetery organized in 1927 as a corporation not for pecuniary profit under "An act to authorize the incorporation of rural cemetery associations and regulate cemeteries." *Rev.* 1877, *p.* 100; *N. J. S. A.* 8:1–1 *et seq.* Cemeteries of the memorial park type seek to achieve the appearance of a park or a garden. In the pursuit of that objective, one means frequently adopted is the use of flat metal grave markers or plaques which are placed flush with the ground rather than monuments or headstones. *Johnson v. Cedar Memorial Park Cemetery Ass'n,* 233 *Iowa* 427, 9 *N. W. 2d* 385 (*Sup. Ct.* 1943).

Defendant Association adopted certain rules and regulations concerning the operation of the park. Identification and monumentation of a grave are limited to a flush type bronze marker of a specified alloy content. The alloy is required to consist of:

```
"Copper  ..................  ..........    85% to 87%
 Tin  ...........  .............  ..       4% to  5%
 Lead  ......  ................  ....      2% to  3%
 Zinc  .........................            5%
 Balance—all other elements
           not to exceed  ..........        1%"
```

The formula set out in the regulations was furnished by the manufacturers, Matthews & Company and the Gorham Company, which are the exclusive suppliers of the defendant. A display room is maintained in the Park where the Association exhibits and sells to lot owners three models of markers which may be had in various designs. Lot owners may supply their own plaques provided they meet the established specifications and subject to the regulation that they shall be installed by defendant. In such cases "[t]he cost of foundation, installation, replacement, maintenance, and continual care of the memorial shall be paid by each lot owner in accordance with the schedule of rates on file in the office of the cemetery, which schedule * * * [is] subject to change without notice." When the memorials

are sold by the Association, a single charge is made which includes installation and continual maintenance.

Plaintiff claims that in selling the markers and in reserving the exclusive right of installation, the Association is engaging in a business venture for profit for which it has no authority under its corporate charter, that it is competing unlawfully with private enterprise, that the rules and regulations pertaining to the sale and installation are invalid and that by means of unfair competitive practices it has successfully prevented lot owners and bereaved families from purchasing markers from plaintiff or others regularly engaged in the business. The trial court concluded that the price of the bronze memorials, which included installation and future maintenance, is reasonable and not excessive, that regulations prescribing the composition thereof and the method of installation are not arbitrary, and that the Association did not prevent lot owners from buying from outside sources markers which conformed to the regulation. However, he did direct that the plaintiff be permitted to install the markers under the supervision of defendant and subject to its regulations as to method and subject to a charge for such supervisory services as well as for future maintenance.

The record reveals that, with but one exception, all of the large number of markers placed on graves during the years of operation of the cemetery were sold and installed by the Association. The one exception was accomplished by the plaintiff, who, without authority, trespassed upon the park grounds in order to affix the plaque to the grave. In two instances when plaintiff made sales, defendant on receiving information to that effect furnished markers free of charge to the lot owners involved.

The Association established a Bronze Division which handled the disposal of markers. The Division is in charge of a salesman who devotes himself exclusively to its work and who receives a commission of 25% of the price for his efforts. Proof was offered to show that on the day before or on the day of the funeral a letter is sent to the family advising that a salesman would call upon them in connection

with memorializing the deceased. Four or five days after the interment, a brochure prepared by the manufacturers concerning the bronze tablets is sent to them by the Association. Then follows a second letter informing of an imminent visit by the salesman. This person makes the call and undertakes to consummate a contract for the sale and installation of the marker. According to his testimony, he tells the family that the purchase may be made from the Association or elsewhere, but if obtained from an outside source a charge will be made for installation, maintenance and perpetual care. There can be no doubt that the Association's intimate contact with the family of the deceased in connection with the burial gives it a decided advantage, competitively and psychologically, over other persons engaged in the business of selling memorials. Proof was adduced by plaintiff to indicate unfair practices and pressures to which lot owners were subjected in order to interfere with and prevent competition by outsiders. In view of the determination we have reached on the major issue, it is not necessary to set forth those facts in detail, nor to express any opinion with respect thereto.

The selling price of a typical marker in 1956 was $195. It included installation and future maintenance. (At the time of the hearing it had increased to $205.) Defendant's office manager broke down the figure as follows:

"1. Cost of marker ............................... $57.00
2. Salesman's commission ........................ 51.25
3. Maintenance expense (including material, wages, depreciation of equipment, taxes on payroll, compensation insurance and all other expenses pertaining thereto) ........................................ 44.95
4. Clerical, bookkeeping, and general overhead ........ 15.65
5. Reserve for replacement due to theft, loss, damage .. 5.50
6. Surplus to cover future rising costs and other maintenance contingencies ........................... 20.65

$195.00"

Actually the defendant had no adequate bookkeeping system, or any record of relevant factors to substantiate these figures except for the cost of the marker to it and the salesman's

commission which almost equals that cost. The trial court felt that the "figures were for the most part established after this litigation was instituted." And much may be said for the argument that the $20.65 represents profit. According to the testimony, it eventuates in the general operating account of the Association and remains subject to ordinary, corporate use. No separate trust fund is set aside for the perpetual care of the bronze markers. For the reason expressed above, namely, the nature of the decision reached, it is necessary only to note the high rate of commission paid to the salesman and the ambiguous character of the proof of cost and profit factors in the sale and installation of the markers.

In our view, the fundamental problem presented is whether defendant has the authority to engage in the business of sale and installation of bronze memorials. Its corporate life and field of operation stem from *N. J. S. A.* 8:1-1 *et seq.* Under *section* 1 of that statute, incorporation is for the "purpose of procuring and holding lands to be used exclusively for a cemetery or place for the burial of the dead." Management of the Association is committed to a board of managers or trustees who (except for the first or organization election) must be plot or lot holders. *N. J. S. A.* 8:1-6, 8. The managers or trustees may sell plots or lots subject to such conditions and restrictions as may be imposed upon the use thereof by rules and regulations adopted by them. *N. J. S. A.* 8:2-10. At least one-half of the proceeds of the sales is required to be appropriated to the payment of the purchase money of the lands acquired by the Association, until the whole thereof is paid. The residue must be used for the "preservation, improvement and embellishment of the cemetery grounds * * * and the avenues and roads leading thereto and to defray the incidental expenses * * *." After the purchase money and the costs of surveying and laying out the lands are paid, the proceeds of all future sales of plots or lots are directed to be "applied to the preservation, improvement and embellishment of the cemetery of the association, and

for incidental expenses, and to no other purpose or object, so long as such embellishment is incomplete." *N. J. S. A.* 8:2–11. Surplus funds from such sales or from any other source (such as a testamentary bequest for the care or beautification of a grave, *N. J. S. A.* 8:2–30), may be invested in designated securities subject to a mandate that the income therefrom shall be used for the maintenance and improvement of the grounds. *N. J. S. A.* 8:2–30, 35, 36 and 37. The managers or trustees are personally responsible for any loss arising from improper investment. *N. J. S. A.* 8:2–40. The lands and property of the Association actually used for cemetery purposes are exempt from taxation or execution sale (*N. J. S. A.* 8:2–27) and it is empowered to enlarge its holdings to a specified extent by condemnation. *N. J. S. A.* 8:2–5.

A corporation so organized and enjoying the special privileges and immunities granted by the Legislature is a charitable trust, and its managers are trustees in charge of the operation of a *quasi*-public institution. Proper administration of the trust is incompatible with the pursuit or the making of a profit. Any scheme directed to that end is unlawful. *East Ridgelawn Cemetery v. Winne,* 11 *N. J.* 459, 464 (1953); *Di Cristofaro v. Laurel Grove Memorial Park,* 43 *N. J. Super.* 244, 255–56 (*App. Div.* 1957); *Passaic Nat. Bank & Trust Co. v. E. Ridgelawn Cemetery,* 137 *N. J. Eq.* 603, 607 (*E. & A.* 1945); *Burke v. Gunther,* 128 *N. J. Eq.* 565, 571 (*Ch.* 1941), affirmed 133 *N. J. Eq.* 609 (*E. & A.* 1943); *George Washington Memorial Park Cemetery Ass'n v. Memorial Development Co.,* 141 *N. J. Eq.* 47, 60, 67 (*Ch.* 1947); *Id.,* 139 *N. J. Eq.* 280, 289–90 (*Ch.* 1947); *De Geeter v. Wolkin,* 136 *N. J. Eq.* 510, 512 (*E. & A.* 1945).

Even though we have not considered it necessary to make a specific finding as to the extent of the profit realized by the Association, the indication of return over cost is sufficiently plain to warrant condemnation of the prices charged for the markers. But the problem calling for decision is more basic. Regardless of the price, does the sale of

memorials exceed the authority granted by the statutory franchise? Defendant admits the absence of specific authorization but claims that under the act, *N. J. S. A.* 8:1–21, and under the General Corporation Act, *N. J. S. A.* 14:3–3, it has the implied power to do so in accomplishing the purpose of its being, *i. e.*, the establishment and maintenance of a place of sepulture of the dead.

As has been indicated, the statute created the Association for the purpose of procuring and holding lands to be used exclusively for cemetery purposes. Of course, reasonable rules and regulations compatible with the accomplishment of that purpose may be adopted. But that incidental right to regulate does not include any power not expressly granted or reasonably contemplated by the charter. *Donahue v. Fitzsimmons,* 95 *N. J. Eq.* 125 *(Ch.* 1923); *People v. Bloomington Cemetery Ass'n,* 353 *Ill.* 534, 187 *N. E.* 455 *(Sup. Ct.* 1933). There is no case in this State where the issue involved here was expressly adjudicated. It was held in *Ewing Cemetery Ass'n, Inc. v. Ewing Twp.,* 126 *N. J. L.* 610 *(Sup. Ct.* 1941), that a crematorium might be operated on cemetery premises. And more recently the Superior Court approved as reasonable a regulation which required all burial vaults to be placed in the grave and sealed by the cemetery staff at a charge to the lot owner. *Luttenberger v. Restland Memorial Park Ass'n,* 51 *N. J. Super.* 507 *(Ch. Div.* 1958). It may be noted, however, as persuasive *dictum* that the Appellate Division in *Di Cristofaro v. Laurel Grove Memorial Park, supra,* after a considerable study of the problem, declared that "[t]here is patently no right to go into the monument business as a general commercial venture in competition with ordinary business enterprises * * *." (43 *N. J. Super.,* at *page* 256).

An acute awareness of the *quasi*-public nature of this charitable trust as well as of its tax exemption and other privileges and immunities is necessary to a solution of the problem. Manifestly, in entering the market for the sale of memorials to lot owners in competition with private enterprise, these factors give the Association a decided com-

petitive advantage. And, as has been said, the advantage is enhanced psychologically through the close contact with the family of the deceased before, at the time of, and after the burial. These factors of preferred economic position and ease of access to prospective customers in promoting sales, in our judgment, make necessary a strict construction of the statute and the charter emanating therefrom in appraising the claim of implied power to engage in the activity in competition with private business. *People ex rel. J. H. Anderson Monument Co. v. Rosehill Cemetery Co.,* 3 *Ill. 2d* 592, 122 *N. E. 2d* 283 (*Sup. Ct.* 1954). The sale of markers is not necessary to the procuring, sale, holding and use of land exclusively as a burial ground. Nor can it be said reasonably that authority to sell them exists by implication as needful, suitable or proper to the effectuation of the purposes of the grant. Such an enterprise is collateral; it has but a slight, indirect and remote relation to the object of the corporate charter. And no one would suggest that a corporate charitable trust can broaden the scope of its statutory grant by means of by-laws. *Cf. Bailey v. Association of Master Plumbers,* 103 *Tenn.* 99, 52 *S. W.* 853, 46 *L. R. A.* 561 (*Sup. Ct.* 1899); 6 *Fletcher, Cyclopedia Corporations* (*perm. ed.* 1950) § 2494, *pp.* 283–84. Accordingly, we conclude that defendant's independent enterprise of sales of memorials is *ultra vires* as well as contrary to the public interest and must be discontinued.

The view expressed finds support in *People ex rel. J. H. Anderson Monument Co. v. Rosehill Cemetery Co., supra,* where the corporation undertook to offer for sale and to sell markers and memorials as a "service" to its lot owners. The Supreme Court of Illinois said "its powers should be strictly construed lest it be put in such a preferred position as to constitute a menace to free enterprise," and that "[d]efendant was chartered and holds its franchise for the single purpose of conducting a cemetery for burial purposes. Whether it has made a profit and accumulated funds [from such sales] is wholly beside the mark." And the conclusion announced was that "the acts of offering for sale and selling

and dealing in markers and monuments by the defendant for installation and use in its cemetery \* \* \* are a usurpation of power not granted by its charter." (122 *N. E. 2d,* at *pages* 286, 287). Reference was made with approval to its earlier decision in *People v. Bloomington Cemetery Ass'n, supra,* which invalidated a regulation forbidding the use of grave boxes or vaults except those purchased from the association. In commenting on the case, the court indicated clearly that the determination would have been the same whether the requirement was for exclusive or permissive purchase from the cemetery. In short, the principle intended to be laid down in both cases is that the sale of memorials exceeded the corporation's express or implied special statutory authority to operate and maintain a place of sepulture. (122 *N. E. 2d,* at *pages* 286–87). It must be said that divergent viewpoints may be found in the comparatively few cases present in the reports in other states on the general subject. They are set forth in *Di Cristofaro, supra* (43 *N. J. Super.,* at *page* 257), and need not be repeated here. Suffice it to say that consideration of our own statutory policy has led us to adopt the ruling of *People ex rel. J. H. Anderson Monument Co. v. Rosehill Cemetery Co., supra.*

It cannot escape attention that the operating practices of cemetery associations have frequently come under public scrutiny. For example, in 1950 the Legislature created a special committee to study the laws concerning cemeteries and mausoleums. Public hearings were held and much testimony was taken. Thereafter, on March 31, 1952, a report of its findings was submitted, which said among other things:

"Your committee has found that certain abuses now practiced by cemetery operators of this State are made possible by deficiencies in existing cemetery laws. In particular, attention is directed to the following:
\* \* \* \* \* \* \* \*
3. Many cemeteries do not segregate care charges from other income. Even when they do, the care funds are frequently not invested according to standards acceptable for trust funds.

4. Permanent care funds are not supervised by the State.

\*  \*  \*  \*  \*  \*  \*  \*

6. Unreasonable cemetery regulations are enforced which result in restraints on the lotholder's choice of monument materials, markers, etc.

\*  \*  \*  \*  \*  \*  \*  \*

8. Many cemeteries are operated as purely business ventures and, as such, do not bear their proportionate share of the tax burden."

Among other things, the committee recommended (1) the establishment of a State Cemetery Board to supervise the activities of cemeteries, except those operated by the various religious faiths, and (2) the adoption of sweeping regulatory legislation. Bills were introduced to accomplish the purpose but they were not adopted. In the 1959 Annual Message of Governor Meyner to the Legislature, he revived the matter, saying:

"Legislation to bring all charitable trusts under the surveillance of the Attorney General will be submitted. \* \* \* There will also be a bill to give better protection to the perpetual care funds of cemetery companies." (*Fifth Annual Message* (January 13, 1959), *p.* 9.)

Our attention has been called also to the special message on the subject given to the Legislature of the State of New York by Governor Thomas E. Dewey on February 11, 1949. He said:

"The law intends these cemetery corporations to be operated without profit and for the mutual benefit of those persons who purchase burial space. \* \* \*.

The People of the State, in recognition of the public aspects, have granted to cemetery corporations certain definite and valuable benefits, including exemption from taxation, and have reposed a serious trust upon those individuals who establish and maintain cemeteries.

\*  \*  \*  \*  \*  \*  \*  \*

\* \* \* From the point of view of lawmaker, law enforcer and layman, the cemetery corporations are dedicated to, and holding their property for, a public use.

There is, however, a shocking disparity between theory and actuality.

The investigation by members of my staff under my direction has disclosed that, far from being operated on a non-profit basis in the interest of the public, a large number—probably larger than is known—have been and continue to be run as lucrative commercial ventures."

Substantial legislative revision of Article 9 of the Membership Corporations Law, Cemetery Corporations, followed. *L.* 1949, *c.* 533. Among other things a cemetery board was created, consisting of the Secretary of State, the Attorney General and the Commissioner of Health. A staff was provided for and broad supervisory and regulatory powers were bestowed. See 6 *New York Consolidated Laws Service, Membership Corporation Law,* §§ 70 to 108–a.

Our holding does not bar the Association from adopting regulations requiring a bronze marker rather than other types of memorial, *Johnson v. Cedar Memorial Park Cemetery Ass'n, supra,* or specifying the composition or design thereof, *Pine Crest Memorial Park v. Burton, Ark.,* 312 *S. W. 2d* 919 (*Ark. Sup. Ct.* 1958). But, of course, they must be reasonable and reasonably and uniformly applied.

In this connection, some additional observations are necessary. The record indicates that over the many years of operation of the cemetery, all of the markers placed on graves (except the one installed by plaintiff through a trespass), were supplied by Jas. H. Matthews & Co. or Gorham Co. The alloy content used by those companies in the manufacture of the plaques became the requirement of defendant's rule. Some of the evidence suggests that these companies have adopted a policy of dealing only with cemeteries. Full development of this phase of the case was not permitted by the trial court. Under the circumstances it seems necessary to add the cautionary admonition that if the restrictive practice exists, and markers of the prescribed composition are not available elsewhere, the rule cannot be regarded as reasonable. There is no showing that a marker to have the necessary quality of durability must have the precise percentage of alloys demanded by the Association. Note that in the *Pine Crest Memorial Park* case, *supra,* the pertinent rule set forth *minimum standards* quite similar but not exactly the same. The markers involved were not manufactured by Matthews & Co. or Gorham Co. After considerable expert testimony had been taken in that case

as to the proper proportions of the tablet's ingredients, the court sustained the rule as not arbitrary, saying:

"A marker prepared under the required formula can certainly be obtained. As the evidence shows, there are dealers who would prepare this particular alloy." (312 *S. W. 2d*, at *page* 923.)

Reference is made to this phase of the matter particularly because the Attorney General has called to our attention the anti-trust suit and consent judgment therein of *United States v. Jas. H. Matthews & Co.,* Docket No. 16818, U. S. District Court, W. D. Pa., decided November 5, 1958. The action involved alleged monopolistic practices relating to the sale of grave markers, and among other things the judgment restrained Matthews & Co. from selling them to any cemetery with knowledge that "such cemetery * * * (2) refuses to install bronze markers, reasonably appropriate for installation in said cemetery, which are sold by other retail marker dealers; or (3) has any rule, regulation, or follows any regularly established course of conduct which makes it unreasonably difficult or more costly to have installed within its confines bronze markers sold by persons other than such cemetery." On the basis of the proof submitted in this case and subject to the caution expressed, defendant's rule is not declared arbitrary.

Plaintiff attacks also the rule which requires initial installation of the marker to be made exclusively by the Association. In keeping with the decorative plan of a memorial park, placement follows a uniform pattern and must be flush with the turf. Mowing and trimming the grass are thus facilitated. The proof shows that the tablet is prone to sinking or shifting if not based properly. At times these conditions arise regardless of adequate construction of the base, simply through action of the elements. Future maintenance, including replacement, is in the hands of the Association, being included in the installation fee. In our judgment, the original setting of the marker has sufficiently intimate connection with the interment and the operation and maintenance of the cemetery to justify adop-

tion of the rule. As was indicated in *Pine Crest Memorial Park, supra,* the circumstances are such that the Association ought to have the privilege of original installation "in a manner that, from its experience, will least necessitate an early resetting." (312 *S. W. 2d,* at *page* 923.)

■ Two additional aspects of the matter must be mentioned. Emphasis has been laid upon the charitable and non-profit character of the Association. Therefore any gain over actual reasonable cost of installation and a reasonable charge for future maintenance is incompatible with its charter and invalid. With respect to the fee for perpetual care of the marker (as distinguished from the lot) it appears that in the past no separate fund has been established for the accumulation of such moneys; nor has the use thereof been limited to the specific purpose for which it was received. These are trust moneys and must be set apart from other revenue and appropriated only to the use for which they were received. They are surplus maintenance funds within the contemplation of *N. J. S. A.* 8:2–35 and should be invested and preserved accordingly.

■ Finally, defendant urges that plaintiff has no standing to institute this action. As has been said, the Association functions as a *quasi*-public charitable trust. As such it is subject to the generally supervisory jurisdiction of the Chancery Division of the Superior Court. *Atlas Fence Co. v. West Ridgelawn Cemetery,* 110 *N. J. Eq.* 580, 591 (*E. & A.* 1932). Whenever the charge is made that the managers or trustees are violating their duty or exceeding the powers granted, the Attorney General, as the principal legal representative of the public charged with the protection of the common interest in the trust, is a necessary party to the litigation. *Passaic Nat. Bank and Trust Co. v. E. Ridgelawn Cemetery, supra* (137 *N. J. Eq.,* at *pages* 607–608). Although he was not joined as a party originally in this suit, he entered an appearance as *amicus curiae* and participated in the proceedings. At the hearing, plaintiff endeavored to make a broad excursion into the financial affairs of the Association, ostensibly to show the general profit

motive claimed to pervade its activities. The refusal of the trial court to allow the pursuit of that objective is raised as error. Our decision on the primary issues presented by the appeal makes unnecessary determination of the question. There is no doubt that the Attorney General may, in an independent proceeding, make such investigation as to the operation of cemeteries created under *N. J. S. A.* 8:1–1 *et seq.* as he deems advisable. In this instance, defendant asserted at the oral argument that its books and records are open to him at his pleasure. Under the circumstances, we are disinclined to interfere with the course taken at the trial.

But the question remains as to whether the *ultra vires* acts of the defendant have violated any private, legal or equitable rights of the plaintiff. His proof, which we accept for the purpose of determining this aspect of the case, tends to show that he was subjected personally to *unfair* and wrongful as well as *ultra vires competitive practices* by the Association, as the result of which he suffered actual and potential damage in his business. This court has taken a liberal view of the standing of a person to protect himself against such loss. *Walker, Inc., v. Stanhope,* 23 *N. J.* 657 (1957). And certainly under the circumstances present here, equity will not tolerate injury to an individual from improper practices by one under its supervision who enjoys special economic advantages by grant of the State. *People ex rel. J. H. Anderson Monument Co. v. Rosehill Cemetery Co., supra;* Comment, *New Use for An Old Remedy,* 50 Nw. U. L. Rev. 410 (1955).

The determination of the trial court is modified as outlined herein and the cause is remanded for the entry of a conformable judgment. No costs.

*For modification*—Chief Justice WEINTRAUB, and Justices HEHER, WACHENFELD, BURLING, JACOBS, FRANCIS and PROCTOR—7.

*Opposed*—None.