Gingrich, Appellant, *v.* Blue Ridge Memorial Gardens.

Argued May 24, 1971. Before BELL, C. J., JONES, EAGEN, O'BRIEN, ROBERTS, POMEROY and BARBIERI, JJ.

*Howard Stern,* with him *Thomas D. Caldwell, Jr., Shavick, Stern, Schotz, Steiger & Croland,* and *Caldwell, Clouser & Kearns,* for appellant.

*Wentworth Darcy Vedder,* with him *David H. Rosenbluth, Morris, Vedder and Fitzkee,* and *Stradley, Ronon, Stevens and Young,* for appellees.

*John H. Bream,* for appellee.

OPINION BY MR. JUSTICE JONES, October 12, 1971:

By reason of the substantial similarity of the issues involved, we will consider both these appeals in one opinion.

Russell Gingrich, trading as Gingrich Memorials (Gingrich), for some years has been engaged in the sale and erection of cemetery markers and monuments in Dauphin County and its environs. Blue Ridge Memorial Gardens (Blue Ridge), a nonprofit and tax exempt corporation, operates a cemetery in Lower Paxton Township, Dauphin County and Marlon Corporation, a corporation for profit, is engaged in the business of soliciting customers, presumably as agent for Blue Ridge, for the purchase of markers and monuments to be placed upon burial lots in Blue Ridge Cemetery.

Bishop Leech, Bishop of the Diocese of Harrisburg (Diocese), in his fiduciary capacity, operates three cemeteries in Dauphin, York and Northumberland Counties. The entity of which Bishop Leech is fidu-

ciary is a religious and charitable trust which is tax exempt and its principal activity is the operation of these three cemeteries.

On September 15, 1969, Gingrich instituted an equity action in the Dauphin County Common Pleas Court against Blue Ridge and Marlon and, on March 31, 1970, Gingrich instituted a similar action in the same court against the Diocese.[1]

The thrust of both equity actions was that Blue Ridge and the Diocese, by engaging in the sale of markers and monuments, was actively competing in business with Gingrich to his financial injury, that Blue Ridge, under its corporate charter, was not authorized to sell and erect markers and monuments and that the Diocese, as a religious charitable trust, could not, as an incident to the exercise of its trust power, sell markers and monuments.

In the court below the issues were determined upon the pleadings. The defendants—Blue Ridge and the Diocese—filed preliminary objections including demurrers and alleged that Gingrich had failed to state causes of action. The court below entered decrees sustaining the preliminary objections and from these decrees the instant appeals were taken.[2]

In sustaining the preliminary objections of Blue Ridge, the court's rationale was two-fold: (a) the certificate of incorporation of Blue Ridge expressly empowered Blue Ridge "to sell, erect and maintain memorials of any character or material", and, therefore, Blue Ridge in the sale of such markers and monuments

---

[1] In the original action—in September 1969—Bishop Leech in his fiduciary capacity was named as a defendant but the action against Bishop Leech was withdrawn and a new action commenced in 1970. Furthermore, Gingrich's allegation that this was a class action was withdrawn.

[2] Although not specifically stated in the decrees, the effect thereof was a dismissal of the several complaints.

was not exceeding its corporate powers and (b) Gingrich lacked any standing to challenge Blue Ridge's alleged excession of its charter powers. In sustaining the preliminary objections of the Diocese, the rationale of the court below was that the Diocese had the implied and incidental power to sell markers and monuments.

Initially, we find that we must disagree with the view of the court below that Gingrich, in the Blue Ridge action, lacked any standing. A century ago the legislature of this Commonwealth enacted a statute which provided: "In all proceedings in courts of law or equity of this commonwealth, in which it is alleged that the private rights of individuals or the rights or franchises of other corporations are injured or invaded by any corporation claiming to have a right or franchise to do the act from which such injury results, it shall be the duty of the court in which such proceedings are had, to examine, inquire and ascertain whether such corporation does in fact possess the right or franchise to do the act from which such alleged injury to private rights, or to the rights and franchises of other corporations, results, and if such rights or franchises have not been conferred upon such corporation, such courts, if exercising equitable power, shall, by injunction, at suit of the private parties or other corporations, restrain such injurious acts; and if the proceedings be at law for damages, it shall be lawful therein to recover damages for such injury as in other cases." (Act of June 19, 1871, P. L. 1360, §1, 12 P.S. 1315, trans. to 15 P.S. §117).[3]

In *Gring v. Sinking Spring Water Co.*, 270 Pa. 232, 113 A. 435 (1921), this Court clearly established guide-

---

[3] This statute draws no distinction between profit and nonprofit corporations. That nonprofit corporations were recognized long before the passage of the Act *see*: *Foreword* (W. E. Zeiter) 15 P.S. pp. 72-73.

lines for the application of the 1871 statute and stated, *inter alia,* the rule to be that "inquiry in a proceeding resting on the statute must bear some direct relation to the ascertainment of a charter power or right to commit the act complained of, and that restraint can be granted only upon a finding of either the nonexistence of the [charter] power or its nonexistence for the purposes to which it is being put to the injury of the complainant." The 1871 Act does not usurp the power of the Commonwealth to inquire into *ultra vires* acts of a corporation or to forfeit a corporation charter; the statute simply grants an individual or corporate body the right in a court of equity to inquire whether or not a corporation is exceeding its charter powers, and, thereby, inflicting an injury upon such individual as distinguished from the public. Moreover, the individual or corporate body must demonstrate to the court of equity that the acts in excession of its charter power *directly* invade his rights as distinguished from consequential injuries. *See: Windsor Glass Co. v. Carnegie Co.,* 204 Pa. 459, 54 A. 329 (1903) ; *Blankenburg v. P. R. T. Co.,* 228 Pa. 338, 77 A. 506 (1910). *Cf. Railroad Co. v. Ellermen,* 105 U.S. 166, 26 L. ed. 1015 (1881).

Even though inadequately and inartistically pleaded, what Gingrich alleges is that Blue Ridge, by selling and erecting markers and monuments, for use in burial plots in its cemetery, is actively competing in business with Gingrich to the latter's financial injury, and that Blue Ridge lacks any power or authority under its charter to sell or erect such markers and monuments. Under the statute, supra, and our case law thereunder, we are of the view that Gingrich does have standing to inquire into Blue Ridge's powers under its charter. *Detting-Hamilton Co., Inc. v. Forest Lawn Gardens, Inc.,* 116 P. L. J. 391 (1968) relied upon by the court below is not controlling.

Our next inquiry is whether Blue Ridge does have the power and authority under its charter of incorporation to sell and erect markers and monuments. Under the certificate of incorporation of Blue Ridge issued on May 13, 1952 (No. 345 March Term of Dauphin County) it is stated that Blue Ridge was formed for various purposes including "to sell, erect and maintain markers of any character or material." It is clear beyond question that in engaging in the sale and erection of markers and monuments Blue Ridge was acting within a specifically authorized charter power and that Gingrich lacks a cause of action in equity against Blue Ridge. The order of the court below sustaining the preliminary objections of Blue Ridge was properly entered.

A somewhat different situation is postured in Gingrich's action against the Diocese because the latter is a religious, charitable and tax exempt trust. The right of a religious organization such as the Diocese to maintain burial grounds is statutorily recognized (Acts of April 26, 1855, P. L. 328, §7, June 2, 1887, P. L. 299, §1, May 1, 1907, P. L. 132, §1, May 20, 1913, P. L. 242, §1, June 20, 1935, P. L. 353, §1, 10 P.S. 81) and the Bishop of the Diocese acts as trustee of the property owned by the congregations in the Diocese. *See: Carrick v. Canevin*, 243 Pa. 283, 91 A. 147 (1914).

The court below relied in large part on *Dries v. Evans Cemetery Co.*, 109 Pa. Superior Ct. 498, 167 A. 237 (1933), wherein the Court upheld the rights of a nonprofit cemetery association to require the use of stone, brick or concrete vaults and the right to sell stone vaults at cost to lot owners as an implied corporate power. The Court also held that a "cemetery company had a right, without profit, to transact, in addition to maintaining their main purpose, such subordinate and connected matters which fit essentially or are

426

at least convenient to the due prosecution of the chartered purposes." (p. 503).[4]

The primary function and purpose of the Diocese's religious and charitable trust is to operate and maintain a cemetery or cemeteries. Gingrich contends that, since the trust is tax exempt, to permit it to sell monuments and markers for profit is offensive to public policy. Gingrich does not allege that the Diocese requires that lot owners in its cemeteries buy markers and monuments only from the Diocese; on the contrary, the allegation is that the Diocese engaged, in competition with Gingrich, in the sale of such markers and monuments and that lot owners in the cemeteries may purchase markers and monuments from any source whatever. Based upon that which the pleadings reveal the lot owners may buy either from Gingrich, the Diocese or any other entity engaged in the sale and erection of markers and monuments and regardless from whom the markers and monuments are purchased they may be placed and erected in the Diocesan cemeteries. The fact that the Diocese may receive a profit from the sale of markers and monuments does not detract from the charitable nature of the trust. It has been well stated: "The question is not whether the institution may receive a profit, but what disposition is to be made of the profit, if any, which may be received. If the profits are to inure to the benefit of individuals, the institution is not charitable, but if the profits, if any, are to be applied wholly to charitable purposes the institution is charitable.": Scott on Trusts, Vol. IV, p. 2968 (1967). There is no allegations or averments in the pleadings that any profits realized from the sale of markers and monuments by the Diocese go other than to the care and maintenance of cemeteries and, that

---

[4] *Cf. Slifer v. Greenmount Cemetery Co.*, 164 Pa. Superior Ct. 534, 67 A. 2d 584 (1949).

being so, there is nothing before us to show an alteration of the charitable nature of the trust.

That this trust is tax exempt does not alter the situation. The question of whether the sales of markers and monuments should alter the tax exempt status of the trust is not before us.[5]

We recognize that jurisdictions other than our own have split on this issue.[6]

Markers and monuments are integral parts of cemeteries and essential to the character and type of cemeteries maintained. That entity which operates and maintains a cemetery—whether it be a corporate body or a religious charitable trust—engages in the sale of markers and monuments to lot owners—on a voluntary rather than a compulsory basis—clearly has the incidental and implied power to do so.

We ascertain no action on the part of the Diocese on the face of these pleadings which indicates any excession of its trust powers or which offends public policy.

---

[5] In this connection we note that art. VIII, sec. 2 of our new Constitution—not applicable in the case at bar—provides pertinently: "(a) The General Assembly may by law exempt from taxation: (ii) Actual places of burial when used or held by a person or organization deriving no private or corporate profit therefrom and *no substantial part of whose activity consists of selling personal property in connection therewith.*" (Italics ours).

[6] *Clageit v. Vestry of Rock Creek Parish*, 241 F. Supp. 950 (D. C. D. C. 1965) ; *Wing v. Forest Lawn Cemtery Assn.*, 15 C. 2d 472, 101 P. 2d 1099 (1940) ; *Gasser v. Crown Hill Cemetery Assn.*, 103 Colo. 175, 84 P. 2d 67 (1938) ; *People ex rel. J. H. Anderson Monument Co. v. Rosehill Cemetery Co.*, 3 Ill. 2d 592, 122 N.E. 2d 283 (1954) ; *State ex rel. Benson v. Lakewood Cemetery*, 197 Minn. 501, 267 N.W. 510 (1936) ; *Davisson v. Mt. Moriah Cemetery Assn.*, 87 Mont. 459, 288 Pac. 612 (1930) ; *Frank v. Clover Leaf Park Cemetery Assn.*, 29 N.J. 193, 148 A. 2d 488 (1959) ; *Daily Monument Co. v. Crown Hill Cemetery Assn.*, 114 Ohio App. 143, 176 N.E. 2d 268 (1961) ; *Schaefer v. West Lawn Memorial Cemetery*, 222 Ore. 241, 352 P. 2d 744 (1960).

428

The decrees of the court below sustaining the preliminary objections of the Diocese are affirmed.

Decrees affirmed. Appellant to pay costs.