**STRUCTURE PROBE, INC.**

v.

**The FRANKLIN INSTITUTE.**

**Civ. A. No. 72–2071.**

United States District Court,
E. D. Pennsylvania.

May 1, 1978.

Benjamin M. Quigg, Jr., Morgan, Lewis & Bockius, Philadelphia, Pa., for defendant.

Lawrence D. Berger, Dilworth, Paxson, Kalish, Levy & Coleman, Philadelphia, Pa., for plaintiff.

## OPINION AND ORDER

FOGEL, District Judge.

Plaintiff, a Pennsylvania corporation in the business of selling services on a Scanning Electron Microscope, (SEM), has brought this action against defendant, The Franklin Institute, a non-profit Pennsylvania corporation which also sells such services to the public through its research arm.

The complaint consists of two counts: *Count I* alleges that defendant monopolized and attempted to monopolize a local market for SEM services in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; *Count II* is brought under the pendant jurisdiction of this Court, and avers that defendant's engagement in this business is *ultra vires* both under its charter, and the Pennsylvania Non Profit Corporation Law, 15 P.S. § 117.[1] Based upon the extensive record, requests for findings of fact, conclusions of law, comprehensive briefing and oral arguments, we find for defendant on the merits on both counts, because of plaintiff's failure to meet its burden of proof.

Our findings of fact, discussions and conclusions of law follow:

## FINDINGS OF FACT:

### I. PARTIES, PERTINENT PROVISIONS OF THE PENNSYLVANIA NON PROFIT CORPORATION LAW AND OF PLAINTIFF'S ARTICLES OF INCORPORATION

1. Plaintiff, Structure Probe, Inc., (SP), is a business corporation organized and existing under Delaware law. Plaintiff's principal place of business is in West Chester, Pennsylvania, within the Eastern District of Pennsylvania. (Agreed Fact No. 1)

2. Dr. Charles A. Garber is President of plaintiff and the owner of 100% of its outstanding stock. (Agreed Fact No. 48)

3. Dr. Garber is also president of and owns all of the stock of a second corporation by the same name, which was organized in 1973 and incorporated under the laws of the State of New Jersey. The principal place of business of the New Jersey corporation (hereinafter referred to either as "Structure Probe-New Jersey" or "SPNJ") is in Metuchen, New Jersey, near New York City. Structure Probe-New Jersey is *not* a party to this action and no claim is made on its behalf. (Agreed Facts No. 48, 49)

4. Defendant, The Franklin Institute, (Institute or Franklin), is a non-profit corporation organized and existing under the Pennsylvania Non Profit Corporation Law of 1933, P.L. 289. Defendant's principal place of business is in Philadelphia, Pennsylvania, within the Eastern District of Pennsylvania. (Agreed Fact No. 2)

5. The Franklin Institute operates a Museum and Planetarium open to the public, and engages in a wide variety of scientific and research activities through the Franklin Institute Research Laboratories, (FIRL), and the Bartol Laboratories, both of which are unincorporated divisions of Franklin. (Agreed Fact No. 10)

6. Defendant was originally incorporated under the Act of March 30, 1824, P.L. 206; Section 2 of that Act states the following:

That the objects of the said corporation shall be the promotion and encouragement of manufactures, and the mechanic and useful arts, by the establishment of popular lectures on the sciences, connected with them; by the formation of a cabinet of models and minerals, and a library; by offering premiums on all objects deemed worthy of encouragement; by examining all new inventions submitted to them; and by such other measures as they may judge expedient.

(Agreed Fact No. 3)

7. The Act of March 30, 1824, was amended by the Act of April 18, 1864, P.L. 429; Section 3 provides as follows:

The object of the said corporation shall be, the promotion and encouragement of manufactures, and the mechanic and useful arts, connected with them, by the formation of cabinets of models, minerals, machines, materials, and products, by ex-

---

1. Repealed by Act of 1972, Nov. 15, P.L. 1063, No. 271, § 5, insofar as it related to corpora-

tions not-for-profit. For similar subject matter, see 15 Pa.C.S. § 7781 et seq.

hibitions, and premiums, by a library, and by all such measures, as they may judge expedient.

(Agreed Fact No. 4)

8. Article III, § 301 of the Pennsylvania Non Profit Corporation Law, Act of May 5, 1933, P.L. 289, reads as follows:

A nonprofit corporation shall have the capacity to act possessed by natural persons, but shall have authority to perform only such acts as are necessary or proper to accomplish the purpose or purposes for which it is organized and which are not repugnant to law.

9. Section 301 has been reenacted in the 1972 Non Profit Corporation Law as Section 7501. 15 Pa.C.S.A. § 7501:

Except as provided in Section 103 of this title (relating to subordination of title to regulatory laws), a nonprofit corporation shall have the capacity of natural persons to act.

10. On May 11, 1971, defendant filed restated Articles of Incorporation pursuant to the Pennsylvania Non Profit Corporation Law, Act of May 5, 1933, P.L. 289. Article II of defendant's restated Articles of Incorporation provides:

The purpose or purposes for which the Institute is formed is the perpetuation of the memory of Benjamin Franklin and the promotion and encouragement of science, technology and the mechanic and useful arts. The Institute is organized on a nonstock basis and does not contemplate pecuniary gain or profit, incidental or otherwise, to its members.

(Agreed Fact No. 5)

*II. PRODUCT MARKET:*

11. The Scanning Electron Microscope, (SEM), is an instrument which forms pictures, (micrographs), of a sample by scanning its surface with an electron beam and collecting and amplifying the electrons emitted and/or reflected by the sample. The SEM was initially developed in the early 1960's. (Agreed Fact No. 6)

12. SEMs are unlike an earlier type of electron microscope, now known as the Transmission Electron Microscope, (TEM), in several important respects:

(a) TEMs are analogous to medical x-ray devices; TEM micrographs are formed by electrons which, (like x-rays), pass *through* a sample, and yield a view of the interior of the sample. SEMs, on the other hand, produce pictures which are analogous to ordinary photographs, because SEM micrographs are formed by electrons that do *not* pass through the sample; they are reflected back, through a process which is analogous to the manner in which the human eye forms an image of an object from light reflected from the surface of the object;

(b) TEMs are generally able to achieve higher resolution than SEMs, i. e., TEMs are able to distinguish smaller features at the same power of magnification;[2]

(c) Sample preparation for TEM use is generally more difficult and, therefore, more time consuming;

(d) TEMs do not enable the user to study the surface of a sample as completely as SEMs. SEMs are, therefore, particularly valuable for analysis of surface topography and morphology (structure). Use of the SEM is particularly valuable in the study of metallurgical failure, for example, in which examination of a fractured *surface* is sought. Similarly, if the subject of an inquiry were directed to a study of the protein deposits left by a shampoo on the surface of a hair, the SEM, a surface tool, would be able to yield more meaningful information. (Agreed Fact No. 7)

13. Prices of full-scale SEMs range between $40,000 and $100,000 or more, depending on resolution capability, attachments, the particular manufacturer and other variables. It is generally true that the more expensive SEMs are more efficient and versatile. While all SEM models will furnish the usual and general range of SEM data, certain categories of samples, and the information sought to be obtained,

---

**2.** Magnification refers to the degree of enlargement of an image. Resolution refers to the potential sharpness which an instrument can produce. The latter serves as a limit on the former; beyond a certain point, increased magnification does not reveal more detail, but to the contrary increases graininess, or blurring of the image.

require particular features or attachments which are available only on certain SEM models. (Agreed Fact No. 8)

14. During the late 1960's, a number of firms, located in various geographical sections of the United States, entered the business of selling time and/or performing research for third parties on SEMs for compensation (the "SEM services business"). Among the pioneers in the business were Ernest Fullman, Inc. in Schenectady, New York; Alpha Laboratories in Chicago, Illinois; Applied Space Products in California; and Sperry Rand Microanalysis Laboratory in Rockville, Maryland. (Agreed Fact No. 9)

15. Both plaintiff and the FIRL division of defendant own SEMs and are engaged in the SEM services business. Defendant entered the field on November 3, 1969, and plaintiff embarked upon the SEM services business in June, 1970. (Agreed Fact No. 10)

16. SEM services run the gamut from simply furnishing micrographs of samples provided by the customer, to sample preparation together with analysis and interpretation of the resulting micrographs, to the implementation of broad-based research contracts which may require investigative analysis that would call for the utilization of a wide range of scientific instruments and skills.

(a) The SEM services performed by plaintiff are as follows: (1) preparation of samples for analysis; (2) development of SEM micrographs of the sample by plaintiff's personnel; and (3) oral or written analyses and interpretation of the results by appropriate personnel.

(b) Defendant's contracts for SEM services include use of an SEM together with the services of a technician to operate it. The client, however, is completely responsible for preparation of samples and for interpretation of the results of the SEM process. A limited degree of consultation with the laboratory director may occur.

(c) Execution of research contracts by the Franklin Institute from time to time requires resort to its SEM when needed, as well as utilization of other equipment or research facilities appropriate to the task. Defendant bids only upon such general research contracts which its capacity and resources will permit. SEM research necessitates the presence and contract availability of such a piece of equipment on the premises.

17. The product market consists of those SEM services for which plaintiff and defendant compete with each other to provide to third party customers. The market includes defendant's sale of time on its SEM to external sponsors, but does not include the defendant's internal SEM use for the preparation of contract proposals or for broad investigative analysis, or other work it may do in connection with research projects.

### III.  GEOGRAPHIC MARKET:

18. The record establishes the following relevant factors which a potential customer considers in arriving at a selection of a particular SEM service:

proximity, price,[3] personal relationships,[4] prior business dealings in the SEM or other fields,[5] special skills,[6] special equipment,[7] contractual limitations,[8] problems of particular samples,[9] desirability of direct ex-

---

**3.**  See Findings 38, 39, 47, 48 infra.

**4.**  These are often significant in making initial contacts.  N.T. 1001 [Garber].

**5.**  See Finding 26, infra.

**6.**  Such skills are particularly significant with samples which can be altered or destroyed by the electron beam.  N.T. 1303–05 [Garber].

**7.**  An example is a tensile stage for taking micrographs of human hairs, specially developed by Dr. Garber.  N.T. 1306–08 [Garber].

**8.**  Certain SEM sales which involve large quantities of time, are negotiated at a reduced hourly rate.  Such options were offered by Micron, Structure Probe, and Franklin.  One effect of this reduction in rate is the inducement to customers to stay with the particular service operation that has given such a rate.

**9.**  See N. 5 supra.

change of ideas during microscopy,[10] and time limitations. Proximate and distant customers may attend the microscopy sessions personally. All customers have the option of mailing samples in or dropping them off at the laboratory. (Agreed Fact No. 11)

19. The appropriate geographic market in which plaintiff and defendant compete is a multistate regional one, including potential customers within a radius of approximately 150 miles of Philadelphia. More specifically, we find that the market essentially includes the states of Pennsylvania, New Jersey, Delaware and Maryland; that area of Northern Virginia in the vicinity of Washington, D. C., Westchester County, western Long Island and additional areas in the southern portion of New York State, exclusive of New York City.

20. We are not convinced by the evidence that a local submarket in the near-Philadelphia area is appropriate; if such a market were to be found to exist, at the minimum it would include Bucks, Chester, Delaware, Montgomery and Philadelphia Counties in Pennsylvania; Burlington, Camden and Gloucester Counties in New Jersey; and New Castle County in the State of Delaware. For purposes of this litigation, this nine-county group has been referred to as the "*Delaware Valley*". The eight counties in Pennsylvania and New Jersey are also referred to as the *Philadelphia Standard Metropolitan Statistical Area* (SMSA). (Agreed Fact No. 12)

21. The Philadelphia SMSA is a region determined by economic and socio-cultural criteria which have no direct bearing upon, or relationship to, the distribution of scientific services or industries. It is a shorthand method of describing an area which includes counties in the two states which cluster around Philadelphia.

**10.** Dr. Meakin explained that his personal preference was to interact with clients. Also, a client may receive benefits, either by increased

*A. Distribution of Plaintiff's Customers*:

22. Plaintiff's SEM service customers are located primarily along the East Coast, from North Carolina to Massachusetts. Plaintiff has also provided SEM services for customers located in other states, including Ohio, West Virginia, Michigan, Wisconsin, Illinois and California. Many of these customers have utilized other SEM facilities at various times. (Agreed Fact No. 51)

23. From 1970 through 1974 plaintiff had the following SEM customers:

| | |
|---|---|
| Beyond Delaware Valley | 199 |
| Within Delaware Valley | 87 |
| | 286 |

These customers were distributed as follows:

| Within Delaware Valley | | Beyond Delaware Valley | |
|---|---|---|---|
| Pennsylvania | 70 | Pennsylvania | 13 |
| New Jersey | 7 | New Jersey | 67 |
| Delaware | 10 | Delaware | 2 |
| | 87 | New York | 42 |
| | | Massachusetts | 9 |
| | | Maryland | 9 |
| | | Ohio | 11 |
| | | other states & foreign | 46 |
| | | | 199 |

(Agreed Fact No. 51)

24. From 1970 through 1974 customers located in the Delaware Valley (nine-county area) provided the following proportion of plaintiff's SEM income:

| | |
|---|---|
| 1970 | 33.2% |
| 1971 | 32.6% |
| 1972 | 33.1% |
| 1973 | 36.5% |
| 1974 | 44.7% |

(Agreed Fact No. 53)

*B. Distribution of Defendant's Customers*:

25. From 1969 through 1974, The Franklin Institute had the following number of SEM clients:

| | |
|---|---|
| Within Delaware Valley | 42 |
| Beyond Delaware Valley | 9 |
| | 51 |

Of this total 11 clients had long term contracts, (at least 50 hours use over a six

knowledge, or time saving if present during the microscopy. N.T. 253–59 [Meakin].

month period), and 43 had short term contracts, (3 had both).

These clients were distributed as follows:

| Within Delaware Valley | | Beyond Delaware Valley | |
|---|---|---|---|
| Pennsylvania | 36 | Pennsylvania | 2 |
| New Jersey | 5 | New Jersey | 2 |
| Delaware | 1 | New York | 2 |
| | 42 | Ohio | 2 |
| | | Michigan | 1 |
| | | | 9 |

(Agreed Fact No. 52)

26. All of defendant's long-term clients, and twenty of its short-term clients, had general research contracts with the Institute prior to any SEM contract.

27. During the relevant period 16.5% of defendant's SEM services revenue came from SEM clients located outside the Delaware Valley.

### C. Distribution of Micron's Customers and Competitors:

28. According to the testimony of James Ficca, President of Micron, Inc., a Wilmington, Delaware, laboratory which also provides SEM services, (the only non-party to testify at trial, the largest portion of Micron's business comes from customers located within a radius of approximately 150 miles from its laboratory.

29. Micron competes for SEM business with: The Franklin Institute, Structure Probe, E. M. Ventions and Biodynamics, (now Tousimis), in Rockville, Maryland; Ernest Fullman in Schenectady, New York; Walter McCrone in Chicago; and Photometrics in Lexington, Massachusetts.

30. Structure Probe-New Jersey is also located within the market area we choose to define based upon the entire record.

### IV. THE RESPECTIVE SEM FACILITIES:

#### A. Defendant's SEM Facility

31. In the 1960's the SEM represented the latest development of technology in the field of microscopy. By 1968, it became apparent that the SEM would add a distinctly new dimension to research, thus rendering it a vital piece of equipment for FIRL.

32. Defendant's motivation in obtaining its own SEM stemmed from its desire to have the in-house capacity this new tool would provide in furthering scientific inquiry. This capacity could be utilized in connection with (1) existing research contracts, (2) self-sponsored research, and (3) in attracting additional research contracts.

33. In June, 1967, defendant obtained a quotation on a JEOLCO SEM, and from late 1968 through early 1969 prepared internal proposals relating to the acquisition of the SEM and the creation of a program for its use. Additional quotations were obtained for a JEOLCO model JSM–2 SEM in March and September, 1969; in October of 1969, a demonstrator unit was delivered and put into operation. (Agreed Facts Nos. 28, 29, 36)

34. Defendant, because of limited capital resources, determined that it must generate sufficient outside funds to enable it to "break even" on the purchase and operation of an SEM.

35. Defendant ascertained that certain "for-profit" and "non-profit" companies and organizations were interested in obtaining SEM services. These entities were willing to enter into long-term agreements for such SEM services. During the Summer and Fall of 1969, defendant entered into one-year contractual arrangements to provide time for the use of the SEM facility amounting to a total of 3½ days per week with the following five clients:

a) Rohm and Haas Company, Springhouse, Pa.

b) Kawecki Berylco Industries, Inc., Reading, Pa.

c) General Refractories Company, Philadelphia, Pa.

d) The Brush Beryllium Company, Cleveland, Ohio.

e) The Academy of Natural Sciences, Philadelphia, Pa.

36. All of these companies and organizations had been prior research clients of defendant. Together they had paid a total of $57,750 prior to the commencement of SEM services covered by their respective contracts.

37. Since November, 1969, the SEM thus acquired has been utilized to provide services to its long-term SEM clients and to other clients requiring periodic or infrequent use of the SEM facility for shorter periods. The SEM has also been used to perform work in connection with other "in-house" research contracts and projects as well as defendant's self-sponsored research.

38. The prices defendant established in the fall of 1969, for its SEM services were based on estimates of the revenues necessary to cover operation costs while at the same time amortizing the capital expenses for the acquisition of the JSM–2, together with an additional 10% fee. These prices for the use of defendant's SEM facilities were set at the rate of $41.25 per hour for long-term customers and $50.00 per hour for short-term customers.

39. Cost increases forced the defendant to increase the price to long-term customers, first to $43.75 per hour in November, 1972, and then to $47.50 per hour in February, 1974.

40. Defendant has never lowered the price of its SEM services.

41. *In acquiring an SEM in 1969, and selling time to outside long-term sponsors at prices which were calculated to cover its estimated costs, it was not defendant's purpose or intent to monopolize or attempt to monopolize the SEM services business in the nine-county Delaware Valley area or elsewhere.*

42. (a) Because the demand for SEM services was greater than anticipated, problems in scheduling use of the SEM for internal research contracts during the normal workweek arose. These problems, together with Dr. Meakin's personal concern about the need for a back-up SEM in case of breakdown, led defendant to consider the purchase of a second SEM in early 1970; a less sophisticated model JSM–S1 was acquired in October of 1970.

(b) Following the plan adopted in 1970, both the original JSM–2 and the JSM–S1 were traded in for a newer and more so-phisticated model, the JSM–50A, in May 1973.

43. *It was not defendant's purpose or intent in acquiring the second SEM, the JSM–S1, to exclude competitors, or to monopolize or attempt to monopolize the SEM service business, in the Delaware Valley, or elsewhere.*

**B. Plaintiff's SEM Facility:**

44. Plaintiff commenced its SEM services business in June, 1970. Defendant did not become aware of plaintiff's entry into the field until July, 1970, when it received a customer solicitation letter dated July 1, 1970, containing a brochure describing plaintiff's business and its price schedule. Plaintiff routinely sent this letter to about 1,000 prospective customers between July and December, 1970.

45. The prices which plaintiff charged for its SEM services were apparently established in relation to prices charged by competing SEM service firms; plaintiff failed to furnish or establish any meaningful financial analysis of costs. Plaintiff, at the outset, established its initial price structure based upon the following companies it envisioned as competitors: Ernest Fullman, Schenectady, N.Y.; Photometrics, Lexington, Mass.; Sperry Rand, Rockville, Md.; Micron, Inc., Wilmington, Del.; and Alpha Research, Chicago, Ill.

46. When plaintiff assessed the prices charged by competing SEM service companies at the time it established its own prices, it did not even consider defendant's charges. Plaintiff's founders were unable to contact companies in the Delaware Valley prior to commencement of the operations, and were apparently unaware of defendant's position as a competitor until after it began its own business.

47. *With two isolated exceptions only, plaintiff has never lowered its SEM service prices to meet those of the defendant.*

*Moreover, plaintiff has in fact raised its prices to $70 per hour for mail-in or drop-off work and $85 per hour for laboratory visits.*

### C. Micron's SEM Facility:

48. Micron, Inc., has a SEM laboratory facility in Wilmington, Delaware. It has offered SEM services there since June, 1970. When it began its SEM service, the charge was $50 per hour. Its present standard, not long-term, rate is $70 per hour, and it does not differentiate between mail-order and laboratory visit charges in its price structure.

## V. MARKET SHARES:

49. The record does not disclose the volume of SEM services sold to third parties within the designated market.

50. (a) Within the Delaware Valley sub-market, (nine-county area), SEM services are sold to third parties by the following firms located in that locale:

1) Structure Probe, Inc., West Chester, Pa.  (since 1970)
2) Micron, Inc., Wilmington, Del.  (since 1970)
3) The Franklin Institute, Philadelphia, Pa.  (since 1969)
4) E. I. DuPont de Nemours, Analytical Service Laboratory, Wilmington, Delaware  (since 1971–72)
5) SKF Industries, King of Prussia, Pa.  (since 1975)

(b) The record also discloses that the following firms located beyond the Delaware Valley submarket do at least some SEM services business within it:

1) Battelle, Columbus, Ohio  *
2) Structure Probe-New Jersey, Metuchen, N. J.  (since 1973)
3) Ernest Fullman, Schenectady, N. Y.  (since 1968, approximately)
4) Walter McCrone, Chicago, Ill.  *

* The record does not disclose when these firms entered the market.

(c) With the exception of Structure Probe-New Jersey, the record does not disclose the volume of SEM service business

transacted with Delaware Valley clients by these or other non-Delaware Valley firms.

51. The annual volumes, by hours, and market share of SEM business within the Delaware Valley, based solely upon figures for FIRL, Structure Probe, SPNJ, and Micron, Inc., are as follows:

| | FIRL | STRUCTURE PROBE | | | MICRON | TOTAL |
|---|---|---|---|---|---|---|
| | | (Pa.) | (N.J.) | (Total) | | |
| 1969 | 1000* | | | | | 1000 |
| 1970 | 1536 (89.1%) | 59.89 * (3.5%) | | | 128* (7.4%) | 1723.89 |
| 1971 | 946.2 (49.6%) | 501.02 (26.3%) | | 501.02 (26.3%) | 460.5 (24.1%) | 1907.72 |
| 1972 | 1716 (55.1%) | 542.59 (17.4%) | | 542.59 (17.4%) | 855 (27.5%) | 3113.59 |
| 1973 | 1328.5 (39.8%) | 988.67 (29.6%) | 33.83 (1.0%) | 1022.5 (30.6%) | 990 (29.6%) | 3341.00 |
| 1974 | 1152 (40.9%) | 523.49 (18.7%) | 31.75 (1.1%) | 555.24 (19.7%) | 1110 (39.4%) | 2817.24 |
| 1971 to 1974 | 5142.7 (42.0%) | 2555.77 (22.9%) | 65.58 (0.06%) | 2621.35 (23.4%) | 3415.5 (30.6%) | 11179.55 |

* Part of the year

## VI. ACTUAL MONOPOLIZATION:

52. *Defendant neither exercises or possesses any power in the regional market which even remotely rises to a level that could be termed to be monopolistic.*

53. *Defendant neither exercises or possesses any power in the so-called nine-county Delaware Valley submarket which even remotely rises to a level that could be termed to be monopolistic.*

## VII. ATTEMPTED MONOPOLIZATION:

54. *Defendant's share of the market cannot in and of itself satisfy the requirement that it possess a dangerous probability of success of monopoly because of the absolute failure on the part of plaintiff to establish in the record any intent to monopolize the Delaware Valley submarket.*

55. Since the inception of defendant's SEM services business, the relative proportion of machine time sold to external clients on time-only contracts, as compared to internal contracts, has been as follows:

| | SEM Time Sold To Clients Without Any Research ("SEM-time Contracts") | SEM Time Sold To Clients As Part Of A Research Project ("research contracts") |
|---|---|---|
| 1969 (2 months) | 87.77% | 12.23% |
| 1970 | 92.84 | 7.16 |
| 1971 | 88.84 | 11.16 |
| 1972 | 94.09 | 5.91 |
| 1973 | 84.25 | 15.75 |

56. FIRL's method of fixing prices for its research contracts is to add together the following components:

(a) Cost of direct labor (i. e., salaries) charged to a particular contract;

(b) A percentage (20 to 23 percent) of direct labor as a charge for the cost of fringe benefits;

(c) A percentage of the direct labor and fringe benefits charges (115 to 120 percent) as a charge for the cost of overhead;

(d) Other direct costs such as supplies; and

(e) A "fee" to cover unanticipated costs, such as bad debts, and costs, (such as interest), not allowed under government contracts. (Agreed Fact No. 41)

57. The overhead bid rate, budgeted rate, and actual rates according to both internal and government audits, for FIRL were as follows:

| | Bid Rate | Budgeted Rate | Actual Rate: Internal Analysis | Actual Rate: Government Audit |
|---|---|---|---|---|
| 1968 | 110 | 112 | 125 | |
| 1969 | 115 | 118 | 130 | |
| 1970 | 115 | 116 | 134 | 129 |
| 1971 | 115 | 127 | 141 | 145 |
| 1972 | 115 | 131 | 138 | 143 |
| 1973 | 120 | 132 | 145 | |

(Agreed Fact No. 42)

58. *Plaintiff has absolutely failed to establish any specific intent to monopolize the Delaware Valley submarket.*

## DISCUSSION:

### COUNT I—SHERMAN § 2

Plaintiff has alleged that defendant monopolized and attempted to monopolize the SEM service business in the Delaware Valley since the time of, or prior to, the entry of plaintiff into the same business in the same area. (Complaint, ¶ 6).

■ Section 2 of the Sherman Act provides in pertinent part:

> Every person who shall monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor . . . . (15 U.S.C. § 2).

*With respect to actual monopolization, the Act has been consistently construed to require that a plaintiff establish two elements: (1) possession of monopoly power, and (2) willful acquisition or maintenance of that power, (as distinct from growth or development as a consequence of superior product, business acumen, or historic accident). Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); *Case-Swayne Co. v. Sunkist Growers, Inc.*, 369 F.2d 449, 458 (9th Cir. 1966), *cert. denied* (as to § 2 issues), 387 U.S. 932, 87 S.Ct. 2056, 18 L.Ed.2d 994, *rev'd on other grounds*, 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed.2d 621, *reh. denied*, 390 U.S. 930, 88 S.Ct. 836, 19 L.Ed.2d 995 (1967).

■ With respect to attempted monopolization, only the specific intent to achieve the power to control prices in or foreclose access to a market is required to be established.[11]

■ *We agree with the majority view that plaintiff must prove a dangerous probability of success as an element of the al-*

11. *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 626, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); *Lorain Journal Co. v. United States*, 342 U.S. 143, 153, 72 S.Ct. 181, 96 L.Ed. 162 (1951); *Independent Iron Works Inc. v. United States Steep Corp.*, 322 F.2d 656, 667 (9th Cir.), *cert. denied*, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963); *United States v. Aluminum Co. of America*, 148 F.2d 416, 432 (2d Cir. 1945); *Mt. Lebanon Motors, Inc. v. Chrysler Corp.*, 283 F.Supp. 453, 461 (W.D.Pa. 1968), *aff'd*, 417 F.2d 622 (3d Cir. 1969); *United States v. Jerrold Electronics Corp.*, 187 F.Supp. 545, 567 (E.D.Pa.1960), *aff'd*, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961).

There is a split as to whether a "dangerous probability of success" must be shown in order to establish a case of attempt. In *Lessig v. Tidewater Oil Co.*, 327 F.2d 459 (9th Cir.), *cert. denied*, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964), the Ninth Circuit expressed the

*leged attempt.* As a first step, certainly, relevant geographical and product markets must be defined and established both as to the issues of monopolization and the attempt to monopolize. *See, Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338 at 1348 & n 16 (3d Cir. 1975), and the cases cited *supra.*

> view that a showing only of specific intent, without regard to the realities of the market situation, was necessary to a showing of attempted monopolization, stating:
>
>> We reject the premise that probability of actual monopolization is an essential element of proof of attempt to monopolize. . . . [B]ut the specific intent itself is the only evidence of dangerous probability the statute requires . . . . .
>
> 327 F.2d at 474. This view has been criticized by the First Circuit in *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 508 F.2d 547 (1st Cir. 1974), *cert. denied*, 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975), in which the court stated:
>
>> We . . . note . . . that the status of *Tidewater*, even in the Ninth Circuit, is subject to some uncertainty. [footnote omitted]. The rationale supporting the majority rule appears to us persuasive. To be successful, an attempt case must establish both an intent to monopolize and a dangerous probability of successful monopolization [citing *Swift & Co. v. United States*, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518 (1905); *American Tobacco Co. v. United States*, 328 U.S. 781, 785, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946)]; these elements take on meaning only with reference to an actual or potential exercise of power, which in turn must be assessed in the context of a relevant market. The contrary policy argument—that market definition [the essential to any evaluation of "probability"] should be eliminated in order to permit the application of sanctions to anti-competitive behavior by a single firm which does not approach monopolization—seems unpersuasive. [citations omitted].
>
> 508 F.2d at 550. Although the question facing the court in *Whitten* was the determination of the *product market*, and not *geographic market* as in *Lessig, supra*, the relevant criteria in each situation are akin; thus the position of the *Whitten* court should be applicable to both geographical and product market with respect to the necessity to determine the "probability of success". *See also, Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Co.*, 510 F.2d 1140, 1144 (2d Cir.), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2416, 44 L.Ed.2d 679 (1975); *Rea v. Ford Motor Co.*, 497 F.2d 577, 590 n 28 (3d Cir.), *cert. denied*, 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974); *Agrashell, Inc. v. Ham-*

### A. PRODUCT MARKET:

██ *We find the product market to consist of all sales of SEM services to third parties for compensation, including all time so identified on plaintiff's invoice submissions, exclusive of services provided internally by defendant on internal research contracts.*[12]

> *mons Prod. Co.*, 479 F.2d 269, 287 n 10 (8th Cir.), *cert. denied*, 414 U.S. 1022, 94 S.Ct. 445, 38 L.Ed.2d 313 (1973); *Cliff Food Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203, 207 n 2 (5th Cir. 1969); *Mogul v. General Motors Corp.*, 391 F.Supp. 1305, 1313–14 (E.D.Pa.1975), *aff'd*, 527 F.2d 645 (3d Cir. 1976); *Becker v. Safelite Glass Corp.*, 244 F.Supp. 625, 638 (D.Kan. 1965); *United States v. Johns-Manville Corp.*, 231 F.Supp. 690, 699–700 (E.D.Pa.1964).

12. See Findings 11 to 15, 17.

There was some confusion at trial because of the lack of any formal stipulation to this effect. This confusion arose from the characterization of that portion of the defendant's SEM services which consist of SEM work done on internal contracts, (i. e., projects for which the FIRL retains total technological and research control). Plaintiff contends that the SEM work done in connection with such internal contracts should be included as SEM time sold to third parties because everything done by the FIRL is paid for by some external entity, (the Bartol Fund provision of approximately $10,000 annually is an insignificant exception). See N.T. 361, 395 (Meakin).

The plaintiff claims to find authority for this argument in *United States v. Aluminum Company of America*, 148 F.2d 416 (2d Cir. 1945). Judge Learned Hand was confronted with the problem of classifying the aluminum ingots which Alcoa itself used for fabrication. Were these ingots excluded from Alcoa's production, it would have greatly reduced Alcoa's proportionate share of the supply of aluminum ingots used by others to fabricate products. Judge Hand reasoned that Alcoa's fabricated products satisfied part of the demand for such products, which in turn reduced the demand for ingots by those fabricators. Under this analysis he decided that Alcoa's internal demand should be considered as part of the market which Alcoa supplied.

There are several reasons why that analysis is inapposite to this case. No facts exist which establish that the FIRL would have made the same use of an SEM if the work could not have been performed within the laboratory. Nor is it certain that such work would have been given to plaintiff or Micron, Inc., whom the plaintiff argues are the only two firms within the geographic market it alleges. *Finally, we*

## B. GEOGRAPHIC MARKET:

■ The geographic market in which the plaintiff and defendant compete is more elusive. Such a geographic market must correspond to the "commercial realities" of the market for SEM services and must be an economically significant market area. *See, Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). In *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961), the relevant geographic market was defined as:

> [T]he market area in which the seller operates, and to which the purchaser can practicably turn for supplies.

365 U.S. at 327, 81 S.Ct. at 628.

*See also, United States v. Empire Gas Corp.*, 393 F.Supp. 903 (W.D.Mo.1975), *aff'd*, 537 F.2d 296 (8th Cir. 1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977).

Dr. Meakin, Dr. Garber, and Mr. Ficca testified *in extenso* at the trial; each was completely familiar with the supplier's side of the SEM services business. With the exception of the limited use of the Fullman SEM laboratory by Dr. Meakin, prior to Franklin's original purchase, none of these witnesses was an SEM service customer. Their testimony about the factors which governed a customer's choice of laboratory was persuasive; an extensive, though not exhaustive, list of the relevant factors thus compiled is set out in Finding 18. We recognize that some of these factors may be more significant than others. We are also aware that an SEM service might prefer to limit its clientele, either for valid business reasons or for reasons which violate the antitrust laws, e. g., to those clients only who can be physically present during the microscopy. *However, the commercial realities of the market control, and as a matter of economic reality such a preference can-* not serve to narrow the market in and of itself.

■ *We have considered all of the testimony and exhibits, including such matters as the repeated identification of other SEM laboratories which have done business in the local area, evidence that both plaintiff and defendant have customers at distances from the alleged local market area, and Mr. Ficca's description of a ring of approximately 150 miles around his firm's laboratory containing virtually all of his customers. We hold that the appropriate market is the larger, multi-state area, roughly corresponding to the States of Pennsylvania, New Jersey, Delaware and Maryland; Washington, D.C. and its contiguous counties in Virginia; and certain parts of New York State, including western Long Island and the area south of and including Westchester County, exclusive of New York City.*

■ In choosing this market area, we recognize that Micron and The Franklin Institute both enjoy a clientele that is located in the greater Philadelphia area. However, legitimate business decisions made by Micron dictate its present concentration of business in the Delaware Valley. These decisions were adequately described in the sealed testimony of Mr. Ficca. In the case of FIRL, it initially sought customers with which it had already been in contact, i. e., customers for which FIRL had previously performed research. Dr. Meakin testified that he also used local business listings to make initial contacts. Even though The Franklin Institute concentrated on the local market, there were also contacts beyond the greater Philadelphia area. Two of the Institute's initial long-term customers are located outside the market area plaintiff attempts to have us define, despite defendant's marked preference for having its clients present during the microscopy ses-

---

must consider the nature of the research contracts themselves. These are broad-based investigations which involve the use of many of the analytical tools available to the FIRL, not simply the SEM. It may well be that in some instances, the findings of the SEM are crucial, but in most cases they represent only addition-

al data which support conclusions arrived at through the results of other areas of technical instrumentation and analysis. In any case, we are unable to conclude on the record before us that the internal use of an SEM by the defendant reduces the demand for SEM services in the market to third parties.

sions. The record establishes that eighteen percent of the Institute's customers come from locations beyond the Delaware Valley, while only six percent of defendant's customers were from areas beyond the region which we consider to be the appropriate market. In fact, the only witness who did not restrict his preference for the situs of customers, was Dr. Garber, plaintiff's president; he testified emphatically that he was prepared to take customers from any location. Approximately one-third of plaintiff's customers are located within that area which we have found to be the relevant market. (Finding 23). *We reject the argument that the plaintiff's disproportionately low share of the Delaware Valley market is the result of the defendant's alleged monopolistic practices. Among the reasons for this determination are the following: (1) defendant was the first SEM service operating within a considerable distance of Philadelphia, and necessarily had a natural monopoly over that business in any alleged Delaware Valley market; see, Union Leader Corp. v. Newspapers of New England, Inc., 284 F.2d 582, 584 (1st Cir. 1960), cert. denied, 365 U.S. 833, 81 S.Ct. 747, 5 L.Ed.2d 744, reh. denied, 365 U.S. 890, 81 S.Ct. 1026, 6 L.Ed.2d 201 (1961); see also, Venzie Corp. v. United States Mineral Prod. Co., 382 F.Supp. 939 (E.D.Pa.1974), aff'd, 521 F.2d 1309 (3d Cir. 1975); Ovitron Corp. v. General Motors Corp., 295 F.Supp. 373 (S.D.N.Y. 1969); (2) many of defendant's customers would, or at least might, have considerable loyalty to a business which had served them well for months or years; (3) our reasoned assumption that the relationships which develop through direct interaction with the Institute personnel might have some bearing on a customer's decision to continue to utilize defendant's skill and services; (4) plaintiff's difficulties as a late-comer trying to take business away from initiators. Dr. Meakin's comment that the people with whom he dealt, by and large, "had even less contact with costs and things than I did", reveals that while price undoubtedly was a factor it was by no means the only or even the predominant factor in obtaining clients. Proximity, likewise, was unquestionably significant, but proximity alone was not* sufficient to keep customers. The other factors which enabled defendant to retain its Delaware Valley customers in the face of plaintiff's fierce competition simply are not violations of the antitrust laws. The Franklin Institute is a revered organization; it has done much good, and there are people in this world who do have loyalties that impel them to continue to work with an organization for that reason alone! They just are not compelled by the same motives which compel plaintiff and other clearly commercial companies whose sole goals, albeit proper, are profit, and profit alone!*

*Even if plaintiff's share of the Delaware Valley market were less than that which it considers its fair competitive share, a hypothesis which we absolutely reject, we find it is so limited because of ordinary and legitimate business choices made by potential clients, and not because of any improper activity on the part of the Institute. Accordingly, we find the distribution of plaintiff's customers accurately reflect the scope of the true geographic market.*

Assuming, arguendo, that the plaintiff is correct in asserting the existence of a nine-county Delaware Valley submarket, what is the effect of such a submarket in this fact situation? Because only a moderate portion of plaintiff's business comes from this area, while substantial amounts of both defendant's and Micron's business are from the same area, the issues raised might be significant. *Case-Swayne Co. v. Sunkist Growers, Inc.,* 369 F.2d 449 (9th Cir. 1967), *cert. denied* (as to § 2 issues), 387 U.S. 932, 87 S.Ct. 2056, 18 L.Ed.2d 994, *rev'd on other grounds,* 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed.2d 621, *reh. denied,* 390 U.S. 930, 88 S.Ct. 846, 19 L.Ed.2d 995 (1967). *While we specifically find that the Delaware Valley is not the appropriate market, we also find that even this sharply curtailed local market has not been subject to either illegal monopolization or attempted monopolization.* In our evaluation of these facts, we will discuss their effect on this hypothetical submarket.

## C. *MARKET SHARE:*

Having determined the appropriate product and geographical markets, we must zero in on the market share of each party. This is one of the inchoate factors which is not often directly addressed, but is extremely pertinent to a determination of the possession of monopoly power, or a significant possibility of obtaining that power, given the requisite intent. *See generally, Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961); *Hudson Valley Asbestos Corp., Inc. v. Tougher Heating & Plumbing Co., Inc.*, 510 F.2d 1140 (2d Cir.), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2416, 44 L.Ed.2d 679 (1975).

■ Plaintiff, again, in this area, has not come near to meeting the requisite burden of proof. Plaintiff concentrated its fire on the three competitors located in the Delaware Valley; (while we have information about another competitor located within this regional market—Structure Probe New Jersey), there is considerable testimony about other competitors doing business within this broader market area about whom there is no market information whatsoever. This absolute failure by plaintiff to prove its case, without more, would in and of itself be fatal, both with respect to the issues of monopolization and attempted monopolization. *However, with respect to the four competitors about whom we have market information, FIRL does not even approach a share of this market which would justify a finding of monopoly power or even a dangerous probability of success in an attempt case. Becker v. Safelite Glass Corp.*, 244 F.Supp. 625 (D.Kan.1965).

As to the alleged local submarket, plaintiff has only produced a scant record aimed at the three firms located therein. An analysis of market shares which is made on the premise that only these firms represent the entire market, is, of course, incorrect; any market share so determined would be decreased by the extent of the competition from firms located outside the market.

By our calculations [13], the defendant had over fifty percent of the market in only one

year (1972), while its market share varied from 39% to 49% in other years. Its average market share for years 1971–1974 was 42.0%.

*Even these inaccurate findings do not establish that the defendant had a predominant share of this Delaware Valley market. The most we could conclude, were this data accurate, is that defendant had a sufficient market share for a possible probability of success—if, and only if—the specific intent, necessary to a finding of attempted monopolization, were established; this plaintiff absolutely and categorically failed to do.*

## D. *MONOPOLIZATION:*

■ In the final analysis, actual monopoly power is not a specified share of the market, nor is it determined by the definition of a market. As stated in *United States v. E. I. DuPont De Nemours Co.:*

[A] party has monopoly power if it has, over 'any part of the trade or commerce among the several states,' a power of controlling prices or unreasonably restricting competition.

351 U.S. 377, 389, 76 S.Ct. 994, 1004, 100 L.Ed. 1264 (1956).

*See also, Case-Swayne Co. v. Sunkist Growers, Inc.*, 369 F.2d 449, 454 (9th Cir. 1966), *cert. denied*, (as to § 2 issues), 387 U.S. 932, 87 S.Ct. 2056, 18 L.Ed.2d 994, *rev'd on other grounds*, 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed.2d 621, *reh. denied*, 390 U.S. 930, 88 S.Ct. 846, 19 L.Ed.2d 995 (1967).

The use of market shares as a relative measure of monopoly power was the focus of the court in *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir. 1945). There Judge Hand spoke of Alcoa's 90% market share:

That percentage is enough to constitute a monopoly; it is doubtful whether sixty or sixty-four percent would be enough; and certainly thirty-three per cent is not.

148 F.2d at 424.

■ The Supreme Court has not defined a specific line between illegal monopoly .

---

**13.** Since the prices charged by these three firms differed significantly, both in amount and

in service, realistic comparison can only be made by using the hours of services sold.

**1286**

power and ordinary competitive power; nor do we feel that such an absolute limit would be appropriate. Monopoly power, as defined in *DuPont, supra,* is a factual determination. This may be difficult in many instances, but it is nonetheless capable of determination on a case by case basis.

Defendant has barely half, or less than half, of a drastically narrowed submarket allegedly under its control. Plaintiff has demonstrated an ability to obtain significant quantities of work in that submarket, despite prices which are as much as 60% higher; we do not even know if this situation reflects the "non-price" elements that are part and parcel of a potential customer's decision to use a particular service.

Micron, Inc., has also demonstrated its ability to compete with defendant in that local market [N.T. 1606 (Ficca)].[14] We do not believe that this showing would warrant a finding of the inability to exclude competition or control prices. *Cliff Food Stores, Inc. v. Kroger, Inc.,* 417 F.2d 203 (5th Cir. 1969); *Independent Iron Works, Inc. v. United States Steel Corp.,* 322 F.2d 656 (9th Cir.), *cert. denied,* 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963).

▆ The only years in which the defendant had a clearly predominant share of the alleged submarket were 1969 and 1970, the year prior to and the year of the plaintiff's and Micron's entry into the SEM services market. *For a firm to appear to have a monopoly, and to have a predominant share in fact, when no one else is competing is not the type of conduct which is punishable by the antitrust laws. See, e. g., Venzie Corp. v. United States Mineral Prod. Co.,* 382 F.Supp. 939 (E.D.Pa.1974), *aff'd* 521 F.2d 1309 (3d Cir. 1975). *It is only when that "natural monopolist" has sought to acquire, maintain or expand that position by lawful means that this position becomes cognizable*

as an offense under the antitrust laws. *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); *United States v. Griffith,* 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948).

▆ *Nothing in this record even remotely establishes that defendant has used any improper means to acquire its initial share in the market, or to maintain or expand that share.[15] Indeed, since plaintiff entered the market, defendant's SEM services business has at least been steady, or fallen off slightly, while plaintiff and Micron have been successful in acquiring a larger share of the submarket. Plaintiff has not met its burden of proving defendant monopolized even the alleged Delaware Valley submarket.*

**E. ATTEMPTED MONOPOLIZATION:**

Plaintiff has not established that defendant possesses monopoly power in the appropriate geographic market or even in the Delaware Valley. Plaintiff has only shown that it is possible that the defendant might have a significant share in the alleged submarket. In order to determine the significance of this fact, we must consider the remaining element of an attempt case—specific intent to monopolize. *Swift & Co. v. United States,* 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905).

Plaintiff relies on three theses in its attempt to demonstrate defendant's specific intent. *First,* defendant urges several hypotheses, including (a) its analysis of the defendant's financial situation during the initial acquisition period, (b) the decision to acquire a second SEM, and (c) a letter from Dr. Meakin to his superior (P–14) in which the justification for this second purchase is stated as "[t]o take advantage of the excess demand not useable [*sic*] on our current

---

**14.** Much of the testimony on this point was stricken as hearsay; Mr. Ficca stated that his source of information about *lost* customers came from the clients themselves. However, the example we cite was a successful bid solicitation by Micron. We do not consider this information to be subject to the infirmities which prompted us to strike the other testimony.

**15.** Certainly, " 'increasing sales' and 'increasing market share' are normal business goals, not forbidden by § 2 [of the Sherman Act] *without other evidence of an intent* to monopolize." (Emphasis added) *United States Steel v. Fortner Enterprises, Inc.,* 429 U.S. 610, 612 n 1, 97 S.Ct. 861, 864, 51 L.Ed.2d 80 (1977).

SEM." Plaintiff alleges that all of these "facts" demonstrate a predatory expansionist intent, similar to the kind condemned in *Alcoa, supra.*

*Second,* plaintiff refers to the degree of use that defendant has made of its own SEMs, relative to the use of the facilities made by the external sponsors and clients. Plaintiff argues that the relatively small use proves that defendant had no actual need of an SEM in the first place. The later expansion of its facility to include a second machine, plaintiff argues, when viewed in this light, could only have been the result of an expansionist motive. Since defendant gained knowledge of the plaintiff's competing SEM service prior to the final signing of the order for the second SEM, plaintiff would have us conclude that the defendant's purchase was a responsive tactic, which in light of *Alcoa, supra,* establishes an illegal specific intent.

*Third,* plaintiff states it has performed elaborate calculations on the accounting and cost data provided by defendant prior to and at trial, in an attempt to show (a) that defendant was pricing its SEM services below cost, (b) that it knew that it was doing so, and (c) that this was a deliberate ploy designed to prevent plaintiff or any other competitor from entering the alleged submarket. *See, Ovitron Corp. v. General Motors Corp.,* 295 F.Supp. 373 (S.D.N.Y. 1969).

We reject all of plaintiff's arguments; they are facile and superficially worthy of consideration, but utterly without foundation given scrutiny of the record before us.

We have no doubt that FIRL was in a deficit position throughout much of the last decade. (N.T. 1902–09 [Dees]; Agreed Fact No. 40). They had just constructed and moved into a new laboratory building. There was a downturn in the economic climate, in particular, with respect to government research contracts. The need to fill some of the space in the new laboratory building might have been one of the motives which prompted the Institute to enter the SEM services business. However, it was also completely rational for an organization such as the FIRL to desire to acquire such a new instrument, one which represented a scientific breakthrough with an exciting potential for research.

*Careful pre-study of the purchase, even to the extent of insisting that the instrument have sponsors prior to acquisition, demonstrates that the Institute never intended to carry the machine at a loss, or to allow it to become a drain on FIRL's resources.* In the first year when Dr. Meakin saw this enormous potential, his letter to his immediate superior urged him to approve the purchase of a second microscope. Dr. Meakin did not suggest doubling the facility; instead he recommended a more moderate plan which would ease the pressure of breakdowns and provide greater capacity, and at the same time not drain the Institute's financial resources. That this letter was written over a month before Dr. Meakin learned of plaintiff's existence, clearly negates the argument that the second purchase was retaliatory. It was a well-reasoned, and honest judgment of a scientist-businessman. *We reject the theory that this advice is the equivalent of the consistent and long-standing predatory pattern of internal expansion which would demonstrate specific intent to monopolize.* Hiland Dairy, Inc. v. Kroger Co., 402 F.2d 968 (8th Cir. 1968), *cert. denied,* 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748 (1969); *Independent Iron Works, Inc. v. United States Steel Corp., supra.*[16]

We are not convinced that a mere recitation of hours charged to internal contracts is any measure of the value of an SEM

---

16. *The Supreme Court has recently commented that "no inference of intent to monopolize can be drawn from the fact that a firm with a small market share has engaged in nonpredatory competitive conduct in the hope of increasing sales." United States Steel Corp. v. Fortner Enterprises, Inc.,* 429 U.S. 610, 612 n 1, 92 S.Ct. 861, 864, 51 L.Ed.2d 80. *We have concluded that Franklin's market share is not a basis for a finding of monopolization, and that its conduct was in no way predatory; that those conclusions lead us to determine that there was no intent on the part of Franklin to monopolize is in accordance with the Supreme Court's formula.*

facility to Franklin from a scientific viewpoint. There is no question about the fact that several of the Institute's clients made more use of the machine on an annual basis than did FIRL itself, but the Institute personnel were present when these clients used the machine, and Dr. Meakin or other FIRL personnel would do some minor consultation on particular problems on occasion—work which must therefore be considered of benefit to the Institute and its personnel. Dr. Meakin testified that he collaborated on several research papers which developed from work done for outside clients. On occasion, internal research contracts would also develop from a situation initially diagnosed by a client who was using the SEM.

■ *In sum, we find that these scientific benefits accrued to the FIRL simply from the operation of the SEM on its premises. Expansion of the facility arose from the conclusion that increased use could be made of the facility, if additional time were available. The FIRL was simply unwilling to purchase the instrument out of the capital equipment fund, thereby increasing its overhead, when other firms and institutions also wished to make use of a machine with the SEM's capabilities. Plaintiff has utterly failed to prove specific intent to monopolize.*

Nor, do we find that defendant deliberately priced its SEM services below that which it believed to be its true costs. The SEM prices were calculated in accordance with the procedures applied to all general research contracts [17] with one significant exception; that item is the machine charge, a flat charge of twenty dollars per hour. Ordinarily, the cost of this equipment would be covered by the overhead charge; but in this instance the SEM was not purchased from the capital equipment budget, but was financed from this machine charge, which would allow full amortization of the machine(s) in three years and still pay for the film and miscellaneous supplies. In addition, a final figure of ten per cent was added to recover unanticipated costs and permit the FIRL to break even if its budget expectations were not fulfilled.

Plaintiff maintains that the overhead figure used for defendant's price structure in bids was arbitrary, because the actual overhead figure, which was developed fifteen months later, was consistently higher. The management of the FIRL was aware that both the overhead figure used in bids and the overhead figure used in the budget were lower than the actual overhead. This does not amount to evidence of deliberate below-cost pricing for the FIRL overall, or for individual units, such as the SEM.[18] Rather, these figures were fixed lower as a planning tool; partly as an incentive to improve the performance of the laboratories, and partly to reflect optimism in the future. The FIRL management realized that if it set its prices too high, it would obtain very few research contracts. This would result in extremely large distributions of overhead costs to these contracts. On the other hand, if prices were such that more research contracts could be secured, the distribution of overhead costs to each would be less, although economically fair. By following the latter course, although FIRL did not have good results for several years, improvement has set in. Thus, while FIRL did set its prices lower because of the lower overhead rate, it did not deliberately plan to finish each year with a deficit.

■ A near-cost or below-cost price alone is not sufficient to prove predatory pricing. *United States v. Empire Gas Corp.,* 393 F.Supp. 903 (W.D.Mo.1975), aff'd, 537 F.2d 296 (8th Cir. 1976), *cert. denied,* 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977). We are not required to determine if

---

17. Finding 56 details the normal summation and the figures which went into it.

18. Dr. Meakin was responsible for preparing contract bids. Part of a bid, including those for SEM contracts, was calculated on the basis of Dr. Meakin's estimate of appropriate requirements, e. g. direct salary requirements, etc. The remainder of the bid would be derived from figures, often percentages, which were given to him. While Dr. Meakin was aware of these component figures, he had no control over them. It appears that he believed his facility was making a positive contribution to the FIRL finances. We find in the record no reason to believe that Dr. Meakin intended to price below cost.

the services were *in fact* sold below cost; it is the *intent* to sell below price which is significant. *We find the defendant did not price in a manner which in fact constituted a predatory practice by a potential monopolist determined to carve out a market. No satisfactory evidence of specific intent to price below cost or specific evidence to monopolize the market for SEM services has been shown. Accordingly, this aspect of Count I must also fail because of an utter lack of proof.*

## COUNT II—ULTRA–VIRES CONTENTIONS:

Plaintiff also alleges that defendant's sales of SEM services to the public is a violation of both its charter and the Pennsylvania Nonprofit Corporation Law (set out in Findings 10 and 8, respectively). This claim is brought under the pendant jurisdiction of this Court. *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 215 (1966); *Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). Defendant has objected strenuously, claiming *inter alia* that: i) there is no common nucleus of operative facts; ii) plaintiff does not have standing to raise the claim; iii) the questions raised are significant and have not been before the Pennsylvania courts; and iv) plaintiff has not presented evidence sufficient to prove its claim.

We permitted the pendant claim to be tried, in order to develop the factual record and to determine if the exercise of our discretion over this cause of action would be appropriate. *Wittersheim v. General Transportation Services, Inc.,* 378 F.Supp. 762 (E.D.Va.1974). *After hearing the evidence presented by the parties, we think it proper to retain jurisdiction and address the claim on the merits (or rather its utter lack of merit).*

Plaintiff asserts that it has standing to raise the claim under *Gingrich v. Blue Ridge Memorial Gardens,* 444 Pa. 420, 282 A.2d 315 (1971). That case involved the consolidated appeals of sellers of cemetery memorials who had brought actions in equity to prohibit competition in the sale of such markers and memorials by both a nonprofit cemetery corporation and a tax-exempt charitable trust. The Pennsylvania Supreme Court held that the appellee had standing under the Act of June 18, 1871, P.L. 1360, § 1, 12 P.S. 1315, trans. to 15 P.S. § 117, to question whether either of the corporations could transact such business; the Court noted the following in pertinent part:

> [T]he statute simply grants an individual or corporate body the right . . . to inquire whether or not a corporation is exceeding its charter powers, and, thereby, inflicting an injury upon such individual as distinguished from the public. Moreover, the individual or corporate body must demonstrate . . . that the acts in excession of its charter power *directly* invade his rights as distinguished from consequential injuries.

444 Pa. at 424, 282 A.2d at 317 (emphasis in original, citations omitted).

The court found that Gingrich, the appellant, had standing because "by selling and erecting markers and monuments, . . . [defendants are] . . . actively competing in business with Gingrich to the latter's financial injury . . . .." 444 Pa. at 424, 282 A.2d at 317. We think the same reasoning supports a finding that plaintiff Structure Probe has standing.

Addressing the merits, the court found an express grant of authority to sell and erect such markers in one of the defendant's certificate of incorporation. The other defendant was a religious charitable trust which operated three cemeteries. This defendant did not require lot owners to buy only their markers, but allowed markers and monuments to be purchased from any source. Any profit realized in connection with any such sale was used for the care and maintenance of the cemeteries. The court concluded that the evidence did not establish an alteration of the charitable nature of the trust.[19]

---

19. The court did note that there was before them no issue as to the effect of such sales on the defendant's tax-exempt status; likewise, no such issue is raised here.

The financial activities of The Franklin Institute are within the grant of its non-profit charter.

*We hold that the operation of a sophisticated tool is completely in keeping with the purpose and character of The Franklin Institute, both under its charter and under the laws of Pennsylvania. Accordingly, we find for defendant on this count of the complaint as well.*

*CONCLUSIONS OF LAW:*

1. Jurisdiction rests in this Court over the subject matter of both counts of the complaint.

2. The relevant product market is "SEM services" sold to third parties for compensation.

3. The relevant geographic market is the area in which the sellers operate and to which the buyers can practicably turn for supplies. *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 327, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961).

4. Submarkets of that geographic market may also exist, depending upon the facts and circumstances of the particular case. *Case-Swayne Co. v. Sunkist Growers, Inc.,* 369 F.2d 449, 457 (9th Cir. 1966), *cert. denied* (as to § 2 issues), 387 U.S. 932, 87 S.Ct. 2056, 18 L.Ed.2d 994, *rev'd on other grounds,* 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed.2d 621 *reh. denied,* 390 U.S. 930, 88 S.Ct. 846, 19 L.Ed.2d 995 (1967).

5. The appropriate geographical market is regional and multistate in character, including Pennsylvania, New Jersey, Delaware, Maryland and the area surrounding Washington, D.C., Long Island and southern New York State up to and including Westchester County (exclusive of New York City).

6. Plaintiff has failed to establish that defendant possessed monopoly power either in the geographic market, as defined above, or in the alleged nine-county Delaware Valley submarket. *Becker v. Safelite Glass Corp.,* 244 F.Supp. 625 (D.Kan.1965).

7. Plaintiff has not established attempted monopolization both by its failure to prove specific intent to monopolize and a dangerous probability of success. *Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Co.,* 510 F.2d 1140 (2d Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2416, 44 L.Ed.2d 679 (1975).

8. Plaintiff has not established that defendant had a dangerous probability of success in the geographic market as defined above.

9. Plaintiff has failed to establish that defendant had the requisite specific intent to monopolize.

10. At the time this action was commenced, a private plaintiff had the right to sue a non-profit corporation such as defendant to recover damages sustained as a result of, or to obtain an injunction against, injurious acts which a defendant lacked the right or franchise to do under its charter or the empowering State law. *Gingrich v. Blue Ridge Memorial Gardens,* 444 Pa. 420, 282 A.2d 315 (1971).

11. Under the laws in effect at the time of commencement of this suit, and operating within its charter as then in effect, defendant had the right and franchise to engage in competition with for-profit businesses in the SEM services business.

An appropriate order will issue.

### ORDER:

AND NOW, this 1st day of May, 1978, after trial of the above captioned matter without a jury, consideration of the briefs and oral arguments of counsel, and for the reasons cited in the accompanying Opinion, it is hereby ORDERED, ADJUDGED and DECREED that Judgment on both Counts I and II be entered in favor of defendant, The Franklin Institute; This Order will be and hereby is entered as a final Judgment against plaintiff and in favor of The Franklin Institute. Each party shall bear its own costs.